**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Timothy Nicholas PETERSON, Darryl Ray Hood, Stephen Allen Falk, and Paul Jules Goudeau, Defendants-Appellants.**

Nos. 85–5167, 85–5168, 85–5173 and 85–5174.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 9, 1986.

Submission Vacated Aug. 12, 1986.

Resubmitted Sept. 30, 1986.

Decided March 9, 1987.

Ephraim Margolin, San Francisco, Cal., Victor Sherman, Santa Monica, Cal., and Juanita R. Brooks, San Diego, Cal., for appellants.

Roger W. Haines, Jr., Asst. U.S. Atty., argued, Peter K. Nunez, U.S. Atty., Robert E. May, Roger W. Haines, Jr., Asst. U.S. Attys., San Diego, Cal., for appellee.

Before BROWNING, KENNEDY and BEEZER, Circuit Judges.

KENNEDY, Circuit Judge:

Appellants appeal their convictions for possession of a controlled substance (marijuana) in United States customs waters with the intent to distribute and for conspiracy to destroy goods to prevent seizure, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 955a(c), and 18 U.S.C. §§ 371, 2232. Following denial of their motions to suppress evidence, appellants entered conditional guilty pleas on the possession charge. The parties submitted the conspiracy charge to the district court on a set of stipulated facts, and the trial court convicted.

In early 1984, the Bangkok office of the Drug Enforcement Agency (DEA) learned from a confidential informant of a plan to smuggle thirty-two tons of marijuana from Thailand. The DEA identified appellant Falk as a participant and notified Thai authorities of his presence in that country. In Bangkok, Thai narcotics authorities wiretapped telephones in Falk's rented apartment, and at a government post office where appellant Peterson made calls. The Thai officials provided information from the wiretaps to the DEA, and, since the tapes were in English, the DEA translated some of them.

The DEA and Thai authorities learned that a ship, the *Allyson,* was leaving Thailand for the West Coast of the United States. The *Allyson* stopped in Manila for repairs and then departed, though the Manila office of the DEA and Philippine authorities had been notified of the investigation. Later, the DEA seized the ship in Alaska and found approximately twelve tons of marijuana on board.

The DEA learned that the same persons who arranged for the *Allyson* shipment would use another vessel, the *Pacific Star,* for a second marijuana shipment from Thailand. The DEA found that the *Pacific Star* was en route to the Philippines and notified Philippine authorities. The Philippine Narcotics Command (NARCOM) commenced surveillance on an associate of Falk who resided at an apartment in Manila. NARCOM discovered a tri-band radio transmitter was operating illegally from the apartment and began monitoring and taping the radio transmissions between the apartment and the *Pacific Star.* The frequencies had been obtained from the DEA, and, as many of the transmissions were in code, the DEA deciphered them. Between November 29, 1984, and December 10, 1984, Philippine authorities tapped the tele-

phone in the apartment and provided the DEA with tapes of those interceptions as well. In one of the calls intercepted by the telephone tap, someone talking from the United States referred to "100 south of Cabo."

The United States Coast Guard cutter *Citrus* was engaged to intercept the *Pacific Star* and found it as it headed to a position one hundred miles south of Cabo San Lucas. Lieutenant Commander Giraitis contacted the *Pacific Star* by radio and requested the ship's registration, identification, and travel itinerary. The radio operator on board the *Pacific Star* responded that the ship was Panamanian, had departed the Philippines nonstop for Panama, and was experiencing mechanical difficulties. Giraitis noted that it was unusual for a ship as small as the *Pacific Star* to travel such a long distance nonstop.

Giraitis informed the radio operator on board the *Pacific Star* that he was going to verify the ship's registration with Panamanian authorities and seek permission to come on board, unless the *Pacific Star* would consent to his boarding. Consent was refused. A DEA special agent contacted a Panamanian official concerned with narcotics enforcement and obtained authority for the Coast Guard to search the *Pacific Star* in the name of the Panamanian government; no formal written authorization was obtained at that time. The next morning Giraitis informed the *Pacific Star* that a party would board the ship. The ship did not stop, and its crew set it on fire. As the Coast Guard boarded the *Pacific Star*, that ship rammed the *Citrus*. The *Pacific Star* sank, and the Coast Guard recovered the marijuana. The *Pacific Star* crew jettisoned some marijuana and the Coast Guard recovered it as well.

The principal contention, here and in the district court, has been that the marijuana is inadmissible because unlawfully seized. The bases for appellants' evidentiary challenge are: that discovery of the ship and its contraband is tainted by unlawful wiretaps participated in by United States officials; that the boarding was without statutory authority in any event, among other reasons because the consent of Panama was required and not obtained; and that the search was unlawful because no warrant was obtained. These contentions are unavailing, in part because the factual premises are incorrect and in part because the legal premises are wrong. We explain in further detail.

While neither the Supreme Court nor this court has stated definitively the extent to which fourth amendment protections apply upon the high seas, it has been assumed to apply in our major decisions. *See, e.g., United States v. Troise*, 796 F.2d 310 (9th Cir.1986); *United States v. Cilley*, 785 F.2d 651 (9th Cir.1985); *United States v. Watson*, 678 F.2d 765 (9th Cir.), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982). The government makes the same assumption here, so the case is presented as one in which the fourth amendment is applicable. Because there are multiple, and abundant, grounds for sustaining the actions of the Coast Guard, this is not an appropriate decision to delineate the outer limits of the Coast Guard's authority to stop and board on the high seas and then to search below decks.

We begin by considering whether the Philippine wiretap tainted the stop of the vessel and the subsequent discovery of the contraband. The government does not argue that the suspicious behavior of the *Pacific Star* and its crew, the crew's actions in setting it on fire, the ramming of the *Citrus*, or jettisoning of the cargo were independent criminal acts so attenuated from the wiretap that the taint is broken; and as the record is somewhat unclear respecting the sequence of these events, we treat the case as one in which suppression of this evidence would be required if evidence from the wiretap itself is inadmissible. We conclude that evidence from the wiretap is not subject to the exclusionary rule under the circumstances of this case.

■ The appellants invite us to consider the possibility that the evidence is the fruit of illegal wiretaps not only in the Philippines, but also in Thailand. We disagree. The wiretaps in Thailand led the DEA to the seizure of the *Allyson*, not the *Pacific*

*Star.* A confidential informant, not the wiretaps, alerted the DEA that the *Pacific Star* would be in the Philippines. The chain of any taint from the Thai wiretaps was broken. *Cf. Wong Sun v. United States,* 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963).

■ Appellants suggest that the interception of radio transmissions between the apartment in Manila and the *Pacific Star* was an illegal search. This conclusion is untenable. The broadcasts took place on channels in open use, most often by fishermen. The appellants had no legitimate expectation of privacy in the radio communications. *United States v. Rose,* 669 F.2d 23, 25 (1st Cir.) (no privacy expectations in radio transmission because not "objectively reasonable"), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982). The evidence derived from the radio transmissions was not obtained illegally.

■ These contentions aside, the point reduces to whether the Philippine wiretap, which allowed authorities to locate the *Pacific Star,* was an illegal search. The government maintains the appellants lack standing to assert that wiretap was illegal, and the district court so held. We conclude, however, that at least one of four appellants has standing to contest its legality.

Appellant Falk declared that he "resided in" the Manila apartment from September 1984 to December 31, 1984. He said also he was a sublessee of the apartment. Although the government had a chance to cross-examine Falk on these matters, it chose not to do so. Falk's assertions in the affidavit are uncontradicted and establish a possessory interest in the apartment sufficient to confer standing. *Alderman v. United States,* 394 U.S. 165, 176, 89 S.Ct. 961, 968, 22 L.Ed.2d 176 (1969). Our conclusion that Falk had standing requires us to reach the substance of appellants' various claims. In light of our ultimate resolution of these claims, we need not decide whether any of the other appellants had standing.

■ We must address whether agents of the United States had sufficient participation in the wiretaps to invoke exclusionary rule analysis. With certain exceptions not applicable here, fourth amendment principles do not apply to searches by foreign authorities in their own countries, even if the targets of the search are American. *United States v. Rose,* 570 F.2d 1358, 1361 (9th Cir.1978). If, however, United States agents' participation in the investigation is so substantial that the action is a joint venture between United States and foreign officials, the law of the foreign country must be consulted at the outset as part of the determination whether or not the search was reasonable.

■ The district court concluded that no joint venture existed between United States and Philippine authorities. United States agents, however, termed their actions a "joint investigation" in their own testimony. The DEA was involved daily in translating and decoding intercepted transmissions, as well as advising the Philippine authorities of their relevance. The DEA treated the affair as one in which the marijuana was destined for the United States, and so assumed a substantial role in the case. In all of the circumstances here, we are unable to conclude that the DEA's role was subordinate to the role of Philippine authorities. *Cf. Stonehill v. United States,* 405 F.2d 738, 746 (9th Cir.1968), *cert. denied,* 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969). The district judge erred in concluding that the operation was not a joint venture.

The propriety of the wiretaps under principles of Philippine law presents a more difficult question. The district court found that there was an insufficient showing to establish a violation of Philippine law. Foreign law, though formerly treated as an issue of fact, is now recognized as an issue of law, to be established by any relevant source, including testimony. Fed.R. Crim.P. 26.1; Fed.R.Civ.P. 44.1. As an appellate court, we are able to determine the relevant legal standards. *See* Miller, *Federal Rule 44.1 and the "Fact" Approach to Determining Foreign Law: Death*

*Knell for a Die-Hard Doctrine,* 65 Mich.L. Rev. 613, 689–91 (1967) (appellate courts should be free to examine foreign law questions on appeal). At our request, the parties filed supplemental briefs on the question.

Two provisions of Philippine law control the inquiry, the first being article IV, section 4, of the Philippine Constitution. The section provides: "(1) The privacy of communication and correspondence shall be inviolable except upon lawful order of the court, or when public safety and order require otherwise. (2) Any evidence obtained in violation of this or the preceding section shall be inadmissible for any purpose in any proceeding." The second law is provided by Republic Act 4200, Philippine Permanent and General Statutes, Trinidad, Ed. (Quezon City 1978):

> It shall be unlawful ... to tap any wire or cable....
>
> Nothing contained in this Act, however, shall render it unlawful or punishable for any peace officer, who is authorized by a written order of the Court, to [wiretap] in cases involving the crimes of treason, espionage, provoking war and disloyalty in case of war, piracy, mutiny in the high seas, rebellion, conspiracy and proposal to commit rebellion, inciting rebellion, sedition, conspiracy to commit sedition, kidnapping as defined by the Revised Penal Code, and violations of Commonwealth Act No. 616, punishing espionage and other offenses against national security: *Provided,* That such written order shall only be issued or granted upon written application and the examination under oath or affirmation of the applicant and the witnesses he may produce....

All concede judicial authorization was neither sought nor received. This, the appellants argue, should decide the issue, and they cite a student note for the proposition that any wiretap not complying with the judicial authorization procedures of Act 4200 is illegal. *See* Note, *The Wire Tapping Law and Its Constitutional Implications,* 41 Philippine L.J. 352 (1966). The government argues, however, that the statute does not delimit all permissible wiretaps. It contends Act 4200 merely implements the "lawful order of the court" exception to the wiretapping prohibition of article IV, section 4, of the constitution, and that there still remains the further exception for "public safety and order" concerns. We agree. *See* E. Fernando, The Constitution of the Philippines 661–62 (2d ed. 1977). The government also points out that a presidential executive order, signed November 16, 1972, and since repealed, made it illegal for anyone to wiretap *unless* that person complied with Act 4200. Presidential Decree No. 55, Penalizing Unauthorized Telephone Installations, Philippine Permanent and General Statutes, Trinidad, Ed. (Quezon City 1984) (repealed 1981). This decree would have been unnecessary if Act 4200 were the exclusive source of exceptions to the prohibition on wiretapping.

We have found no Philippine court decision interpreting the scope of the public safety exception in article IV, section 4, and we have little guidance in determining whether the wiretap here, an interception intended to interdict a major drug ring, would fall within the clause. Philippine courts have a long history of construing their constitution in favor of individual liberties. *See, e.g., Marcelo v. De Guzman,* 114 Philippine Sup.Ct.Reports Ann. 657 (1982); *see also id.* at 664 (Aquino, J., concurring) (holding that evidence seized pursuant to an insufficiently particular warrant must be excluded). We conclude it is plausible that the term public safety is intended for grave threats directed to the security of the state or its people, not for a discrete transaction to distribute drugs outside the Philippines. We will assume the correctness of this view for analytic purposes. We decide the case on the assumption that the search did not comply with Philippine law and was, as a result, not reasonable under the fourth amendment.

Although local law of the Philippines governs whether the search was reasonable, our law governs whether illegally obtained evidence should be excluded, and the essence of our inquiry is whether exclusion serves the rationale of deterring federal officers from unlawful conduct. At this

point, the good faith exception to the exclusionary rule becomes part of the analysis. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The determination whether federal officers will be deterred by the exclusion of evidence in a federal courtroom is a decision that necessarily implicates federal interests, and federal law determines whether the exclusionary remedy should be invoked.

■ The good faith exception is grounded in the realization that the exclusionary rule does not function as a deterrent in cases in which the law enforcement officers acted on a reasonable belief that their conduct was legal. It is true, as appellants note, that *Leon* speaks only in terms of good faith reliance on a facially valid search warrant. That is not dispositive, however. We conclude that the reasoning applies as well to reliance on foreign law enforcement officers' representations that there has been compliance with their own law. *See also Massachusetts v. Sheppard,* 468 U.S. 981, 989–90, 104 S.Ct. 3424, 3429, 82 L.Ed.2d 737 (1984) (holding that officers were entitled to rely on a magistrate's representations that all necessary changes to the form of the warrant would be made). American law enforcement officers were not in an advantageous position to judge whether the search was lawful, as would have been the case in a domestic setting. Holding them to a strict liability standard for failings of their foreign associates would be even more incongruous than holding law enforcement officials to a strict liability standard as to the adequacy of domestic warrants. We conclude that the good faith exception to the exclusionary rule announced in *Leon* applies to the foreign search.

■ We do not suggest that objectively unreasonable reliance on foreign law officers can cloak the search with immunity from the exclusionary rule. That said, permitting reasonable reliance on representations about foreign law is a rational accommodation to the exigencies of foreign investigations. The reliance in this case was objectively reasonable. A review of the record reveals that the federal officers

sought, and received, assurances from high ranking law enforcement authorities in the Philippines that all necessary authorization was being obtained. As our discussion above may indicate, search and seizure law in the Philippines is less than completely clear. We hold that the seized marijuana, and other evidence on the *Pacific Star,* was admitted properly against the appellants' fourth amendment objection to the Philippine wiretap.

Appellants also argue that the wiretap evidence should be excluded as violative of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (1982). We reject this argument. Title III has no extraterritorial force. *Stowe v. Devoy,* 588 F.2d 336, 341 n. 12 (2d Cir.1978); *United States v. Cotroni,* 527 F.2d 708, 711 (2d Cir.1975), *cert. denied,* 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976).

The question whether boarding the *Pacific Star* violated appellants' rights under international law need not detain us. Appellants claim that the seizure of the ship was in violation of article 6 of the Convention on the High Seas, *opened for signature,* Apr. 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200, 450 U.N.T.S. 82 (entered into force Sept. 30, 1962). The ramifications of a violation of international law are largely political, and any violation of international law here is relevant only as it informs our decision on whether the search was or was not in violation of our statutory and constitutional standards. The treaty is not self-executing in the sense that it confers individual rights on these litigants to suppress evidence. If the search was properly authorized, a violation of the treaty would not allow for exclusion of the evidence. *See United States v. Williams,* 617 F.2d 1063, 1089–90 (5th Cir.1980). In any event, as we discuss below, Panama's consent removes international law concerns from the case. *Id.*

■ The statutory authority of the Coast Guard to stop and board the vessel is the next subject of discussion. The underlying assumption that absence of statutory authority would require suppression of the

evidence need not be explored, for we find that the Coast Guard had statutory authority for its actions.

The Coast Guard was acting within its statutory authority in boarding the ship. 14 U.S.C. § 89(a) provides, in part, as follows:

> The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance.

21 U.S.C. § 955a(c) makes it illegal to knowingly manufacture, distribute, or possess with the intent to manufacture or distribute controlled substances, while in the customs waters of the United States. The statute specifically applies to the high seas and does not restrict the Coast Guard to actions based on reasonable suspicion or probable cause. It has been held in the Fifth Circuit that reasonable suspicion is required if the Coast Guard chooses to rely on the jurisdictional predicate that a foreign vessel is operating in violation of American laws. *Williams*, 617 F.2d at 1076. In the instant case, however, the statutory basis for asserting jurisdiction over the vessel is that it was boarded within the customs waters of the United States.

The *Pacific Star* was within such waters. 21 U.S.C. § 955a points to 19 U.S.C. § 1401(j) to define "customs waters"; this definition is also found in 19 U.S.C. § 1709(c). Section 1709(c) enacts that customs waters can be extended beyond the normal limit of one hour's sailing time, provided there exists an arrangement between the United States and the foreign country.

■ Panama and the Coast Guard arranged for the Coast Guard to board the ship. The telex message that the Coast Guard received read: "GOVT OF PANAMA HAS AUTHORIZED U.S. COAST GUARD TO BOARD, SEARCH AND SEIZURE SUBJ VESSEL ON THEIR BEHALF IF EVIDENCE WARRANTS THIS ACTION." Appellants argue that the arrangement was merely conditional, and that, fairly read, it does not give authority to board. While it is true that the message is conditional, the conditions were satisfied. The Coast Guard had evidence to justify the boarding; and the message required no more.

Appellants argue that the proper authorization procedures were not followed in obtaining the consent. A foreign service officer, however, testified that the Panamanian inspector, directly responsible for the authorization, did in fact have the power to give authority to the Coast Guard to board ships. The testimony also indicated that the procedure does not involve a warrant. Other courts have admitted teletype messages in lieu of warrants. *See, e.g., United States v. Loalza-Vasquez*, 735 F.2d 153, 157–58 (5th Cir.1984); *see also United States v. Gonzalez*, 776 F.2d 931, 935–37 (11th Cir.1985) (telephone authorization sufficient). This was sufficient to extend the customs waters of the United States.

■ We also reject appellants' argument that section 955a, so construed, is an improper and unconstitutional exercise of extraterritorial jurisdiction. We conclude that there was more than a sufficient nexus with the United States to allow the exercise of jurisdiction. There was substantial evidence that the drugs were bound ultimately for the United States. Where an attempted transaction is aimed at causing criminal acts within the United States, there is a sufficient basis for the United States to exercise its jurisdiction to arrest and try the offenders. *See, e.g., United States v. Baker*, 609 F.2d 134 (5th Cir.1980). Further, drug trafficking may be prevented under the protective principle of jurisdiction, without any showing of an actual effect on the United States. *United*

*States v. Pizzarusso,* 388 F.2d 8, 10–11 (2d Cir.), *cert. denied,* 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968). Protective jurisdiction is proper if the activity threatens the security or governmental functions of the United States. Restatement Second of Foreign Relations § 33. Drug trafficking presents the sort of threat to our nation's ability to function that merits application of the protective principle of jurisdiction. *Cf. United States v. Marino-Garcia,* 679 F.2d 1373, 1378 n. 4 (11th Cir.1982), *cert. denied,* 459 U.S. 1114, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983). Accordingly, we conclude that jurisdiction was properly exercised over the appellants.

In concluding that the cited statutes properly authorize the search, we do not hold that statutes are the exclusive source of the Coast Guard's power to stop, board, and seize ships. There may be other sources of governmental power that would authorize a stop. *United States v. Ramsey,* 431 U.S. 606, 615, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977) (executive authority is a possible source of permissible searches); *Williams,* 617 F.2d at 1074 ("*Ramsey* indicates that the source of authority for a seizure or search need not be statutory...."). In this case, however, the search was authorized statutorily, and we need not consider the availability of other sources.

■■■ The question we next face is whether the search violated the fourth amendment, which, as we have stated earlier, is here assumed to be applicable.

The appellants argue that whatever the statutory authority to board, the fourth amendment prohibited the search and seizure that followed. There is much imprecision as to what search took place and what was seized as a result of it. The vessel itself sank despite the Coast Guard's efforts to save it; the crew was arrested for criminal acts which occurred on the scene as well as for violations of the drug laws; and, apparently, some marijuana was jettisoned and some floated from the hold as the ship sank. We would be justified in rejecting appellants' claims for such lack of specificity, particularly as it prevents us

from applying rules of standing which again come into play, it being well settled that the crew has no legitimate expectation of privacy in the cargo hold of a vessel. *United States v. Pinto-Mejia,* 720 F.2d 248, 255 (2d Cir.1983), *modified on other grounds,* 728 F.2d 142 (2d Cir.1984). We need not rest our conclusions on this basis, however. Assuming that this was a stop and a search for criminal violations at the outset, and that fourth amendment protections are fully applicable, a point that is far from settled, there was probable cause to search and seize the vessel, its cargo, and its crew. Searches of vessels on the high seas in such circumstances may be warrantless, as the location of the vessels and the practical difficulties of obtaining a warrant while at sea present exigent circumstances under well-accepted principles. *United States v. Cilley,* 785 F.2d 651, 653–55 (9th Cir.1985); *United States v. Maybusher,* 735 F.2d 366, 372 (9th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985). We find, therefore, no constitutional or other invalidity in the stop, the board, the search, or the seizure of the evidence in this case.

■■■ Appellant Falk raises the question whether the district court should have granted his motion for leave to take the deposition of four Americans and two Panamanians, all located in Panama, in order for Falk to ascertain the validity of Panama's consent to the Coast Guard's boarding. The district court denied the taking of the depositions but ordered subpoenas for two of the Americans. This matter is within a district court's discretion. *Furlow v. United States,* 644 F.2d 764, 767 (9th Cir.), *cert. denied,* 454 U.S. 871, 102 S.Ct. 340, 70 L.Ed.2d 175 (1981). Falk made no showing that the other four witnesses would submit to oral depositions, or that their testimony would not be cumulative of the other two witnesses.

We next decide whether the district court improperly admitted into evidence, at a pretrial hearing, an exhibit containing: (1) a letter from the United States embassy in Panama requesting written confirmation of Panamanian consent to board the *Pacific*

*Star*, and (2) a certificate, indicating written confirmation, from the Director General of the Consular and Shipping Affairs Section of Panamanian Ministry of Finance and Treasury. The exhibit was admitted for its truth, and is therefore hearsay.

Appellants argue that the exhibit did not possess sufficient "circumstantial guarantees of trustworthiness" to be admissible under Federal Rule of Evidence 803(24). Appellants point out that the Panamanian certificate was dated three weeks after the seizure. The certificate also stated that it was "at the request of the United States Embassy." The embassy letter, purporting to request the certificate, was dated one month *after* the date on the certificate. We do not believe, however, that the district judge abused his discretion in admitting the exhibit. *United States v. Burreson*, 643 F.2d 1344, 1349 (9th Cir.), *cert. denied*, 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981). An embassy official testified that, because the embassy regularly requests confirmation, the confirmation was prepared ahead of time. In any event, even without the document, there was substantial evidence of Panamanian consent, most notably the telex sent to the Coast Guard.

■ We finally consider whether there was sufficient evidence to convict the appellants of conspiracy to destroy property, i.e. the marijuana, in violation of 18 U.S.C. § 2232. Appellant Peterson contends, without any citation, that section 2322 does not have any extraterritorial reach. However, since section 2322 proscribes conduct related to section 955a, we think it untenable that Congress did not intend a similar reach.

In reviewing the sufficiency of the evidence to sustain a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). The answer to this question, in this case, is "yes." The evidence shows

that the marijuana was thrown overboard from the *Pacific Star*, and that the ship was set on fire. Under these circumstances, a rational trier of fact could have found a violation of section 2322 beyond a reasonable doubt.

The judgment of the district court is AFFIRMED.