**UNITED STATES of America**

v.

**Ralph STAINO.**

**Crim. No. 87–00258–06.**

United States District Court,
E.D. Pennsylvania.

July 28, 1988.

Ferreri should be punished for not having con-

Michael Levy, Barry Gross, Philadelphia Strike Force, Philadelphia, Pa., for plaintiff.

Robert F. Simone, Philadelphia, Pa., for defendant.

## MEMORANDUM

O'NEILL, District Judge.

Defendant filed a motion to suppress physical evidence seized at the time of his curred with the winning side.

arrest in the Dominican Republic.[1] After consideration of the motion and the government's memorandum of law, and following a hearing and oral argument, I denied defendant's motion.[2] At that time, I stated on the record that I would file a memorandum setting forth the basis for my decision. My findings of fact and conclusions of law are set forth below.

### A. Findings of Fact

1. On January 11, 1988, Special Agent Charles Warner arrived in the Dominican Republic. Transcript of July 11, 1988 Hearing (hereinafter Tr.), at 16. He requested the assistance of law enforcement officials in the Dominican Republic to locate the defendant. Tr. 16. He possessed a warrant for defendant's arrest that was issued by the United States. Tr. 17.

2. Agent Warner was instructed by the American Embassy and the FBI officials in Puerto Rico that he could not carry firearms in the Dominican Republic. Tr. 17. Only Dominican authorities are permitted to possess firearms. Tr. 17.

3. After surveying a particular residential area, Agent Warner notified the Dominican police of the defendant's whereabouts. Tr. 17–18, 27. The Dominican officials then conducted surveillance of this residential area. Tr. 28. I credit Agent Warner's representation that he never instructed the Dominican police to go to the defendant's residence. Tr. 29. Agent Warner merely relayed information to the Dominican officials and showed them photographs of defendant.[3] Tr. 18. These

officials decided, on their own, that they were going to a residence to determine if Mr. Staino lived there. Tr. 30. According to Agent Warner, the interest of the Dominicans in the defendant was that he was illegally in their country. Tr. 30. He had not committed a crime in the Dominican Republic. Tr. 30.

4. On the morning of January 13, 1988, Agent Robert Williams,[4] Agent Warner and two police officers went to Mr. Staino's residence. Tr. 29. The two police officers knocked on his door and talked to him briefly.[5] Tr. 19. Mr. Staino testified at the hearing that one of the officials who knocked on the door was a United States Marshal who accompanied him on the plane from Puerto Rico to Philadelphia.[6] Tr. 48, 50. On cross-examination, however, Mr. Staino was unable to identify the Marshall by name. Tr. 59–60. I credit Agent Warner's testimony that both officers who knocked on the door were Dominican. Tr. 19.

5. At the time that the Dominican officers first approached the residence, Agent Warner and Agent Williams were in a vehicle 100 yards from defendant's house. Tr. 19.

6. The two Dominican officers then returned to the vehicle where Agents Warner and Williams were located. Tr. 20. To verify defendant's identity, the Dominican officers again examined the photographs of defendant, which Agent Warner possessed. Tr. 20.

---

1. The items seized were two notebooks, some loose papers, and some photographs.

2. During oral argument on the suppression motion, defense counsel raised the question of whether the items seized were admissible, even if the Court ruled that the evidence should not be suppressed. I reserved judgment on ruling as to admissibility; however, a subsequent agreement of counsel obviated the need for this ruling. Without waiving his position on the motion to suppress, defendant's counsel agreed to waive any objection to the admissibility of the items because the government agreed to admit the contents of the entire diary. Counsel also agreed to redact any objectionable portions of the diary.

3. One of the photographs was a State of Florida identification card in the name of Joseph Esposito, issued June 19, 1987.

4. Agent Williams is an FBI agent from Puerto Rico who, because of his fluency in Spanish, accompanied Agent Warner. Tr. 17.

5. The content of this conversation is irrelevant to my ruling.

6. After defendant was arrested, he was expelled from the Dominican Republic. Tr. 25. He was sent to Puerto Rico, given a remand and identification hearing, and then sent to Philadelphia. Tr. 25.

7. The Dominican officers returned to Mr. Staino's residence to arrest him. Tr. 20. According to Agent Warner, he did not instruct them to take defendant into custody. Tr. 31. They made an independent decision to arrest Mr. Staino. Tr. 31–32.

8. Mr. Staino testified that the two men who had just spoken with him again came to his door. Tr. 49. This time they arrived with drawn guns and told him that he was under arrest. Tr. 49. He also noticed four other officers with drawn guns surrounding the house. Tr. 50. Mr. Staino claimed that two of the officers present were United States Marshals, whom he recognized on the plane from Puerto Rico. Tr. 49. I am unable to credit defendant's testimony because he was unable to identify one of the Marshals on the plane, *see supra* ¶ 4, and because he was unsure whether one or two Marshals accompanied him on his flight to Philadelphia. Tr. 64. Moreover, on cross-examination Mr. Staino did not know whether the Marshal(s) had guns (Tr. 64), even though he had testified on direct examination that the officers surrounding the house had their guns drawn. Tr. 50. I credit Agent Warner's testimony that he did not see any Marshals arrest defendant or search his residence.[7] Tr. 69.

9. Defendant was placed in handcuffs and brought outside the house. Tr. 51. At this time, Agent Warner walked up the driveway with Agent Williams and approached defendant. Tr. 20. With Agent Williams interpreting for Agent Warner, Agent Warner identified defendant after asked to do so by the Dominican officials. Tr. 20–21. Agent Warner and Mr. Staino exchanged words in the driveway (Tr. 21, 54), but Agent Warner did not attempt to question him. Tr. 24, 54.

10. Agent Warner took pictures of the defendant outside his home with a camera belonging to the Dominican officials. Tr. 55, 69, 78. They gave Agent Warner permission to use the camera. Tr. 78. They also took some photographs at the scene. Tr. 78–80.

11. The Dominican officials told Agent Warner that the search of the residence would take place upon the arrival of the local District Attorney, who would identify himself to the defendant and conduct the search. Tr. 22–23. The District Attorney came to defendant's residence. Tr. 22. Mr. Staino testified that a man in a suit came to his home while he was in custody, but that he did not know his identity. Tr. 61–62.

12. While the search was being conducted by the Dominican officials, Agent Warner remained outside the house in the driveway. Tr. 35–36. He neither searched nor asked to search the premises. Tr. 23. He did not ask the Dominican officers to search the house. Tr. 23, 33–35. After the search began, Mr. Staino was taken from his home by the Dominican police. Tr. 24, 35–36. Agent Warner left the premises before the search was completed. Tr. 35–36. He was not shown any seized items at the scene or later that day. Tr. 23–24, 34. To the extent that Mr. Staino's recollection of Agent Warner's involvement in the search differs from that of the Agent, I credit the Agent's testimony.

13. On January 14, 1988, the Dominican officials gave Agent Warner an envelope that contained items taken during the search. Tr. 24. Agent Warner did not request these articles and did not know of any other items that were seized. Tr. 34–35, 41–42.

14. Agent Warner did not travel to Puerto Rico with the defendant. Tr. 25.

### B. Conclusions of Law

15. Neither the Fourth Amendment nor the exclusionary rule applies to searches conducted in foreign countries by foreign officials. *See United States v. Callaway*, 446 F.2d 753, 755 (3d Cir.1971), *cert. denied sub nom. DeVyver v. United States*, 404 U.S. 1021, 92 S.Ct. 694, 30 L.Ed.2d 670 (1972); *see also United States v. Maher*, 645 F.2d 780, 782–83 (9th Cir.

---

**7.** Agent Warner was aware of the presence of Marshals in the Dominican Republic when de-

fendant was arrested. Tr. 68–71.

1981); *United States v. Morrow*, 537 F.2d 120, 139 (5th Cir.1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977); *Stonehill v. United States*, 405 F.2d 738, 743 (9th Cir.1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969). A clearly established exception to this rule has been created where the involvement of the United States officials is so extensive that it converts the search into a "joint venture" between the United States and the foreign government. *See Callaway*, 446 F.2d at 755; *see also United States v. Peterson*, 812 F.2d 486, 490 (9th Cir.1987); *United States v. Hensel*, 699 F.2d 18, 25 (1st Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); *Morrow*, 537 F.2d at 139; *Stonehill*, 405 F.2d at 743.[8] Although the question is not completely free from doubt, I conclude that the activities of the United States officials in connection with the arrest of defendant and the search of his residence were not sufficient to constitute a joint venture between the United States and the Dominican Republic.

16. A number of significant facts support my conclusion that no joint venture existed. The United States agents were prohibited from carrying guns in the Dominican Republic. Agent Warner did not participate in the arrest or questioning of the defendant, and did not participate in the search of defendant's residence. The Dominican police acted on their own initiative in arresting defendant and searching his home. Neither Agent Warner nor other United States officials instructed the Dominican police to arrest the defendant or to search his home. Agent Warner left defendant's home before the search was completed. He did not receive any articles taken from defendant's home until the day following the search. The articles were given to Agent Warner by the Dominican authorities without Warner's requesting them.

17. My ruling that neither the arrest of defendant nor the search of his home was a

joint venture also comports with the decisions of other courts that have found no joint venture existed, even though the participation of the United States officials was substantial. In *United States v. Marzano*, 537 F.2d 257 (7th Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977), for example, the Seventh Circuit Court of Appeals found no joint venture even though the United States agents instigated the investigation of the defendants who, like Mr. Staino, were fugitives from the United States. *Id.* at 269. The agents also provided information to officials of the Grand Cayman Islands, and were present during portions of the investigation and search of the defendants. *Id.* at 270. Moreover, the Grand Cayman official, through his actions, intended to help the United States. *Id.* at 271. The district court concluded, and the Court of Appeals agreed, that the FBI agents were acting merely as observers. *Id.* at 269. In reaching its conclusion, the Court of Appeals relied on the following facts, a number of which are present in this case: the FBI agents could not carry weapons, like Agent Warner; these agents could not interrogate the defendants or take them into custody; the agents had no jurisdiction in the Grand Cayman Islands; the defendants were arrested for violations of Grand Cayman law; the Grand Cayman official, like the Dominican officials in this case, made an independent decision about what to do with the information provided by the FBI; and the FBI agents, like Agent Warner, Agent Williams, and the Marshals, did not actively interrogate the defendants, search them, or select the evidence to seize. *Id.* at 270.

18. Similarly, in the seminal case of *Stonehill v. United States*, 405 F.2d 738, the Ninth Circuit Court of Appeals concluded that the extensive involvement of a United States agent was insufficient to constitute a joint venture. In *Stonehill*, the involvement of the United States official was more extensive than that of the agents in this case. Some of the preparation meet-

---

**8.** A second exception to this rule is for action by foreign officials that "shocks the conscience". *See Callaway*, 446 F.2d at 755; *see also Maher*, 645 F.2d at 783; *Morrow*, 537 F.2d at 120

(1976). Defendant does not contend that this exception is applicable and I do not think it applies to this case.

ings for the Phillipine search were held at the home of the agent. *Id.* at 741. The agent suggested a building be included in the search. *Id.* Inadvertently, the Phillipine government was provided a diagram and a memorandum, both drafted by the agent, concerning two targeted buildings. *Id.* The agent was asked for his comment on a warrant that was going to be utilized during the search. *Id.* Moreover, the agent located the "most significant" documents[9] in a warehouse being searched, and pointed out the "record storage area" in an office being searched. *Id.* at 742. In contrast, the agents here did not participate at all in the search and did not select any of the evidence to be seized. *See also United States v. Rosenthal,* 793 F.2d 1214, 1231 (11th Cir.1986) (no joint venture where United States agents were apprised of foreign government's plan prior to arrest and search, and were present when residence was searched), *cert. denied,* ―― U.S. ――, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *Government of the Canal Zone v. Sierra,* 594 F.2d 60, 71–72 (5th Cir.1979) (no joint venture where search solely under control and jurisdiction of foreign government, even though a United States official provided key information leading to search of defendant's house, and was present at scene).

19. In the few cases in which the courts have found a joint venture, the involvement of the United States was more extensive than that presented here. For example, in *Hensel,* the First Circuit Court of Appeals affirmed the district court's finding of a joint venture based on the following facts:

> [T]he Americans began the search, the Americans asked the Canadians to join in the effort, an American DEA agent urged the Canadians to seize the ship if it entered Canadian waters, the RELIANCE (an American ship) showed firepower and provided back-up assistance during the Canadians' boarding, the RE-

LIANCE provided interpreters after the boarding, and an American officer participated in a second search of the PATRICIA [the ship containing drugs].

*Hensel,* 699 F.2d at 25.[10] Agent Warner did not instruct the Dominican police to arrest the defendant or search his home, did not provide back-up assistance because he was not armed, and did not participate in the search. In another distinguishable case, the Ninth Circuit Court of Appeals found a joint venture in the use of a wiretap in the Phillipines. *Peterson,* 812 F.2d at 490. The Court of Appeals reversed the district court's conclusion that no joint venture existed, noting that the United States agents themselves testified that their actions constituted a joint investigation; that the DEA began the investigation, decoded the transmissions and instructed the Phillipine officials of their relevance; and that the Phillipine officials gave recordings to the United States. *Id.* at 488–90. Overall, the DEA assumed a substantial role in the case because the drugs were headed for the United States. *Id.* No such substantial role was assumed by Agent Warner, Agent Williams and the Marshals.

20. Assuming the activity of the United States officials in this case amounted to a joint venture, the exclusionary rule is inapplicable. The government does not contend that the search complied with the Fourth Amendment, as interpreted by United States law. The government also does not contend that it complied with the letter of Dominican search and seizure law. Nevertheless, I conclude that the exclusionary rule does not extend to an official's good-faith reliance on representations of foreign officers that the search complies with foreign law. In *Peterson* the Ninth Circuit Court of Appeals extended the good-faith exception to the exclusionary rule[11] to reasonable reliance on the representations of foreign officials regarding the interpretation of foreign law. *Peterson,* 812 F.2d at

---

**9.** The agent was asked to choose documents that were most significant from an accounting perspective. *Stonehill,* 405 F.2d at 742.

**10.** I note that the joint venture determination in *Hensel* had no effect on the Court's conclusion that the exclusionary rule was inapplicable. *Id.* at 29–30.

**11.** The good-faith exception to the exclusionary rule was created in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Leon,* police officers relied in objective good faith on a warrant that was not supported by probable cause. As stated below, its facts are inapposite but its underlying principles control.

491–92. This extension of the good-faith exception accommodates the special circumstances presented to U.S. law enforcement officials when conducting a search in a foreign country: the lack of familiarity with foreign procedures and foreign law, and the difficulty of imposing the law of the United States on foreign officials. I agree with Justice (then Judge) Kennedy's conclusion that "permitting reasonable reliance on representations about foreign law is a rational accommodation to the exigencies of foreign investigations." *Id.* at 492. In this case, the Dominican police represented to Agent Warner that searches are conducted upon the arrival of the District Attorney. Tr. 22–23. Considering this representation and the presence of the District Attorney at defendant's residence, the reliance by Agent Warner was objectively reasonable.[12] No deterrence is gained by extending the exclusionary rule to these facts.

21. In sum, the evidence seized at defendant's residence in the Dominican Republic will not be suppressed because no joint venture existed and because Agent Warner reasonably relied in good faith on the representations of Dominican officials as to the requirements of Dominican search and seizure law.

**12.** Because of the disposition of this motion, I do not reach the government's contention that evidence should only be excluded when the procedures are "offensive and shocking". Government's Memorandum, at 6–7.