UNITED STATES of America,
Plaintiff–Appellee,

v.

Olaf Peter JUDA; Raymond Edward Missell; Anthony Burg; Frans Gustaaf Van Der Hoeven; and Christopher Dean Paris, Defendants–Appellants.

Nos. 93–10439, 93–10721, 93–10724, 93–10729 and 93–10730.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 4, 1994.

Decided Feb. 2, 1995.

Diane Marie Amann, San Francisco, CA, for defendant-appellant Juda.

Judd C. Iversen & Julie A. Berliner, San Francisco, CA, for defendant-appellant Burg.

Sanford Svetcov & Melinda L. Haag, Landels, Ripley & Diamond, San Francisco, CA, for defendant-appellant Missell.

Benson B. Weintraub, South Beach, FL, for defendant-appellant Van Der Hoeven.

Carl A. Gonzer, San Rafael, CA, for defendant-appellant Paris.

Dennis Michael Nerney, Asst. U.S. Atty., San Francisco, CA & Sara Criscitelli, U.S. Dept. of Justice, for plaintiff-appellee U.S.

Before: SKOPIL, SCHROEDER, and RYMER, Circuit Judges.

SKOPIL, Senior Circuit Judge:

These appeals address the authority of the United States to apprehend individuals on the high seas and the jurisdiction to prosecute them for violations of the Maritime Drug Law Enforcement Act (MDLEA), 46 U.S.C.App. §§ 1901–04. Defendants entered conditional guilty pleas to charges of possession of drugs with intent to distribute, 46 U.S.C. § 1903(a), and arson, 18 U.S.C. § 81. All reserved the right to seek appellate review of the district court's refusal to dismiss the prosecutions for lack of subject matter jurisdiction, and the district court's rejection of their Fourth Amendment claims.

We conclude that there is no statutory or constitutional bar to exercising jurisdiction over these five defendants. We reject defendants' claims that the investigation of their activities and the subsequent stop and seizure of their vessel violated the Fourth Amendment. Finally, we reject the claim of one defendant that he was improperly sentenced.

## FACTS AND PRIOR PROCEEDINGS

United States Customs learned in 1989 that defendant Olaf Juda was the captain of a ship that had off-loaded marijuana on the Oregon coast in 1987. Customs began investigating Juda's current activities and attempted to infiltrate his drug importation business. The investigation tracked Juda to Australia in 1990, where he arranged for the purchase of the vessel Elevation, later renamed the "Malekula." The purchase money came from Switzerland. The bill of sale indicated that the owner was an American ship broker from Miami.

Because the ship had been sold to an American, British ports refused to register it. Attempts were made to obtain a foreign registry for the ship. Several sales transactions were made to give the ship a British owner, reflected by various port records that list the owner as "Leburn Holding Ltd." of Tortola, British Virgin Islands, and "Marine Investments Ltd." of the British Island of Gibraltar. Nevertheless, both the Port of Hong Kong and the Port of Guernsey refused to acknowledge these transactions and to register the ship. The Port of Southampton was then selected for registry, but the registration was never completed. According to Customs, the vessel was eventually listed as belonging to the Leburn Holding Company, which is British. Records from both Australia and Singapore show that the Malekula claimed Guernesy as its port of registry.

Juda left the Malekula with a caretaker in Darwin, Australia and returned to the United States. A DEA narcotics attache at the United States Embassy in Australia approached the Australian Federal Police and asked if a transmitter could be placed on board the vessel. An Australian police superintendent informed the DEA attache that under Australian law the transmitter could be placed on board without a search warrant or court order. An Australian Customs officer lured the caretaker away, and DEA agents and an Australian Federal Police officer boarded the ship and placed a transmitter in an interior wall of the navigation room. The officers later repeated this process to replace the batteries.

Juda began organizing his drug smuggling operation while in the United States, closely monitored by undercover agents. He returned to Australia in February 1991, and he

and defendant Van Der Hoeven sailed the Malekula to Singapore, where defendants Missell, Paris, and Burg boarded the ship. All defendants are United States citizens except Van Der Hoeven, who is a resident alien of the United States.

The Malekula met with a supply vessel or "mother ship" on the high seas, and loaded sixteen tons of hashish. Agents tracked the Malekula through the transmitter. In the early morning hours of July 16, 1991, the Coast Guard cutter Acushnet intercepted the Malekula on the high seas, approximately 530 miles west of Vancouver, British Columbia. On board the Acushnet were Customs and DEA agents.

A small boat was launched from the Acushnet with a Coast Guard lieutenant and crew, two Customs agents, and a DEA agent on board. Radio communication was established between the Acushnet and the Malekula. Juda identified himself as the Malekula's master, and claimed Great Britain as the country of registry. The Acushnet identified itself as the U.S. Coast Guard, and informed the Malekula that a small boat was coming alongside to ask further questions. Juda threatened to shoot if the boat came any closer. The Acushnet promptly ordered the small boat to return. Moments later Van Der Hoeven, instituting a plan agreed to by all defendants, ignited fuel and the Malekula exploded and caught fire. Defendants abandoned ship, and were rescued and taken on board the Acushnet. Coast Guard members boarded the Malekula to fight the fire. Some hashish was retrieved before the ship sank.

The Acushnet radioed a request for a "statement of no objection" from Great Britain to arrest the crew. Great Britain denied the registry claim, and the Acushnet was advised that the Malekula was stateless and therefore subject to the jurisdiction of the United States. Defendants were arrested and transported to San Francisco.

All defendants were charged with possession of hashish on the high seas with intent to distribute, 46 U.S.C.App. § 1903(a); conspiracy to possess hashish, 46 U.S.C. § 1903(j); assault of a federal officer with a dangerous weapon, 18 U.S.C. §§ 111, 1114;

and commission of arson on a vessel within the special maritime jurisdiction of the United States, 18 U.S.C. § 81. Defendants sought to dismiss the charges on the ground that the district court lacked subject matter jurisdiction, and alternatively, to suppress evidence based on the installation and tracking of the transmitter and the nighttime stop and seizure of the Malekula. The district court denied both motions. *United States v. Juda,* 797 F.Supp. 774, 785 (N.D.Cal.1992). Defendants pleaded guilty to possession of hashish on the high seas with intent to distribute, 46 U.S.C.App. § 1903(a), and arson on the high seas, 18 U.S.C. § 81, reserving their rights to appeal the denial of the motions to dismiss and to suppress evidence.

## DISCUSSION

### 1. *Jurisdiction*

Defendants challenge the subject matter jurisdiction of the district court. They contend that their prosecutions are not authorized by the MDLEA and violate the due process clause of the Fifth Amendment because there was no showing of defendants' intent to import the hashish into the United States. Missell and Van Der Hoeven also argue that the court lacks jurisdiction over the arson charges.

### a. *Statutory Jurisdiction*

The MDLEA prohibits drug activity by "any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States, or who is a citizen of the United States or a resident alien of the United States on board any vessel." 46 U.S.C.App. § 1903(a). A "vessel subject to the jurisdiction of the United States" includes a stateless vessel, *e.g.,* "a vessel without nationality." *Id.* at § 1903(c)(1)(A).

Under the plain meaning of the statute, "the Maritime Drug Enforcement Act clearly allows for ... prosecution in the United States regardless of the destination of the drugs." *United States v. Martinez–Hidalgo,* 993 F.2d 1052, 1055 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 699, 126

L.Ed.2d 666 (1994). Nothing in the language of the statute limits its application to defendants who possess drugs intended for distribution in the United States. *See United States v. Howard–Arias,* 679 F.2d 363, 369–72 (4th Cir.) (noting that such a limitation was eliminated by a predecessor statute, 21 U.S.C. § 955a), *cert. denied,* 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 136 (1982).

The United States contends that MDLEA's jurisdictional requirements are satisfied because defendants are all citizens or resident aliens of the United States on board a "vessel without nationality" subject to the jurisdiction of the United States. Defendants do not dispute their respective nationality, but argue that the Malekula was not "stateless."

■ The district court found that the Malekula, "[d]uring its voyage to Canada and at the time of its interception, ... was a 'stateless' vessel." *Juda,* 797 F.Supp. at 778. We agree. The record shows that the vessel was not in fact registered. Juda's assertion to the contrary was apparently rejected as incredible by the district court. The court was entitled, of course, to discredit Juda's self-serving testimony, and to rely on testimony regarding Great Britain's denial of registration and the evidence showing that proper registry was never obtained.

■ Citing *United States v. Maynard,* 888 F.2d 918 (1st Cir.1989), defendants argue that because they claimed British registry, the Malekula was not "stateless" until the Coast Guard received word from Britain denying registration. *Maynard* held that when a shipmaster makes a claim of registry, the United States does not have criminal jurisdiction over the crew until the denial of registry is received. *Id.* at 925–26. We have held, however, that when MDLEA jurisdiction is premised on consent of the flag nation, such consent relates back to activity that occurred prior to consent. *United States v. Kahn,* 35 F.3d 426, 430 (9th Cir.1994). Congress surely did not intend to allow an unregistered vessel to flee or crews to destroy evidence between the time that the vessel is stopped and the time the United States receives word that the vessel is unregistered. We agree with the district court that the

Malekula was stateless at the time that it was stopped by the Coast Guard. Thus, the court properly rejected defendants' statutory challenges.

b. *Due Process*

■ We have held that to satisfy the due process clause of the Fifth Amendment, extraterritorial application of federal criminal statutes requires the government to demonstrate "a sufficient nexus between the defendant and the United States so that such application would not be arbitrary or fundamentally unfair." *United States v. Davis,* 905 F.2d 245, 248–49 (9th Cir.1990), *cert. denied,* 498 U.S. 1047, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991) (citation omitted). "To meet the nexus requirement, the government must show that the plan for shipping drugs was likely to have effects in the United States." *Kahn,* 35 F.3d at 429. Thus, "[a] sufficient nexus exists where the ship with drugs is bound ultimately for the United States." *United States v. Aikins,* 946 F.2d 608, 613–14 (9th Cir.1990).

Defendants argue that the government was required to prove that they intended to import drugs into the United States. The district court rejected this argument, concluding that "[t]he basic requirements for a constitutional exercise of jurisdiction are minimal contacts meeting a basic test of fairness." *Juda,* 797 F.Supp. at 779. The court determined that Juda's activities in the United States, including his arranging for the purchase of the Malekula, securing its crew, and organizing the operation, provided "a sufficient nexus to support the constitutional application of United States laws" to these defendants. *Id.* It is not necessary for us to decide whether such minimal contacts might satisfy our nexus requirement.

We conclude that the circumstances here—the prosecution of United States citizens and a resident alien on board a stateless vessel—do not require the government to demonstrate nexus to satisfy due process. Our prior case law has imposed a nexus requirement in situations in which the United States seeks to prosecute foreign nationals on board foreign flag vessels. Neither our court, nor

any other circuit, however, has ever held that a nexus requirement is constitutionally required to support jurisdiction over a stateless vessel. *See, e.g., United States v. Pinto–Mejia,* 720 F.2d 248, 260–61 (2nd Cir.1983) ("courts have agreed uniformly that stateless vessels on the high sees are, by virtue of their statelessness, subject to the jurisdiction of the United States"), *modified,* 728 F.2d 142 (2d Cir.1984). We decline defendants' invitation to add such a requirement.

Our conclusion is fully supported by international law principles, which aid us in defining the jurisdictional reach of extraterritorial legislation. *See United States v. Vasquez–Velasco,* 15 F.3d 833, 839–41 (9th Cir. 1994); *United States v. Felix–Gutierrez,* 940 F.2d 1200, 1204–06 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 2332, 124 L.Ed.2d 244 (1993). We look to such principles "to ensure that an extraterritorial application of United States laws is 'reasonable'". *Felix–Gutierrez,* 940 F.2d at 1204.

Under international law, a nation may generally assert jurisdiction over its citizens. *See United States v. Kaercher,* 720 F.2d 5, 5–6 (1st Cir.1983); *United States v. King,* 552 F.2d 833, 850 (9th Cir.1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). *See also United States v. Verdugo–Urquidez,* 494 U.S. 259, 270–71, 110 S.Ct. 1056, 1063–64, 108 L.Ed.2d 222 (1990) (treating resident aliens the same as resident citizens for purposes of constitutional analysis). More importantly, any nation may assert jurisdiction over stateless vessels. *See, e.g., Martinez–Hidalgo,* 993 F.2d at 1055; *United States v. Victoria,* 876 F.2d 1009, 1010–11 (1st Cir.1989); *United States v. Alvarez–Mena,* 765 F.2d 1259, 1264–66 (5th Cir.1985); *United States v. Henriquez,* 731 F.2d 131, 134 (2d Cir.1984); *United States v. Rubies,* 612 F.2d 397, 402–03 (9th Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980). This jurisdiction extends to individuals arrested on board a stateless vessel. *See Alvarez–Mena,* 765 F.2d at 1265–66; *Pinto–Mejia,* 720 F.2d at 258–61; *United States v. Marino–Garcia,* 679 F.2d 1373, 1383 (11th Cir.1982), *cert. denied,* 459 U.S. 1114, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983).

Compliance with international law, of course, does not conclusively determine whether due process is satisfied. *See Davis,* 905 F.2d at 249 n. 2. Thus, we do not "lose sight of the ultimate question: would application of the statute to the defendant be arbitrary or fundamentally unfair?" *Id.* We conclude that application of section 1903 to these defendants is neither arbitrary nor fundamentally unfair. Defendants had ample notice that individuals on board stateless vessels take the chance that any nation might exercise jurisdiction over their illegal activities. Moreover, if no nation exercises jurisdiction, such vessels would "represent 'floating sanctuaries from authority' and constitute a potential threat to the order and stability of navigation on the high seas." *Marino–Garcia,* 679 F.2d at 1382. Accordingly, we conclude that it is not unreasonable, arbitrary, or fundamentally unfair for the United States to apply section 1903 to these defendants.

We reach the same conclusion regarding application of 18 U.S.C. § 81 to these defendants. The arson was perpetrated by United States citizens and a resident alien; the ship was stateless and controlled by United States citizens; and the safety of the Acushnet crew was threatened by the fire. There is no reason for any other nation to exercise jurisdiction. The exercise of jurisdiction over the arson is not arbitrary or fundamentally unfair.

### 2. Fourth Amendment Claims

Defendants contend that the warrantless placement of a transmitter on board their vessel and subsequent monitoring of its signal violated the Fourth Amendment. They also contend that the stop and seizure of the vessel was unauthorized and unreasonable, and therefore the evidence seized should have been suppressed. The district court rejected these contentions, and denied the motions to suppress. *Juda,* 797 F.Supp. at 780–84.

### a. Installation and Monitoring of the Transmitter

The government argues that defendants do not have standing to challenge the

installation of the transmitter. "In order to challenge a search on Fourth Amendment grounds, a defendant bears the burden of demonstrating that he or she had a legitimate expectation of privacy in the place searched." *United States v. Lingenfelter,* 997 F.2d 632, 636 (9th Cir.1993). We agree with the district court that only Juda had any such expectation of privacy. *Juda,* 797 F.Supp. at 781. Juda's apparent ownership interest in the vessel and status as captain support his standing.

██ We agree with Juda that the Fourth Amendment's reasonableness standard applies to United States officials conducting a search affecting a United States citizen in a foreign country. *See Verdugo–Urquidez,* 494 U.S. at 283 n. 7, 110 S.Ct. at 1070 n. 7 (Brennan, J., dissenting); *United States v. Peterson,* 812 F.2d 486, 490 (9th Cir.1987). In *Peterson,* we held that a foreign search is reasonable if it conforms to the requirements of foreign law. *Peterson,* 812 F.2d at 491. Moreover, we concluded that such a search will be upheld under the good faith exception to the exclusionary rule when United States officials reasonably rely on foreign officials' representations of foreign law. *Id.* at 492 (citing *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).

██ *Peterson* controls the question posed here. A DEA agent was told by a Superintendent with the Drug Operations Branch, International Division of the Australian Federal Police, that no warrant was required under Australian law and that an Australian officer would assist with the installation of the transmitter. The DEA agent reasonably relied on that representation, and accordingly, the good faith exception to the exclusionary rule applies.

██ Defendants argue that monitoring of the transmitter to locate the Malekula violated the Fourth Amendment. *United States v. Karo,* 468 U.S. 705, 719, 104 S.Ct. 3296, 3305–06, 82 L.Ed.2d 530 (1984), relied upon by defendants, is inapposite. In *Karo,* the Supreme Court held that a warrant is required before agents may attach a transmitter to a container and monitor it to determine when contraband is taken into a resi-

dence. *Id.* at 719, 104 S.Ct. at 3305–06. In this case, the transmitter was not used to determine whether contraband was on the Malekula. It was used only to determine the location of the Malekula on the high seas. There is no privacy right in one's location on the high seas. *See United States v. Knotts,* 460 U.S. 276, 284–85, 103 S.Ct. 1081, 1086–87, 75 L.Ed.2d 55 (1983) (Fourth Amendment does not apply to use of transmitter to locate vehicle on public roads); *United States v. Butts,* 729 F.2d 1514, 1517 (5th Cir.) (en banc) (no privacy right in the location of aircraft in public airspace), *cert. denied,* 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984). Consequently, Juda's Fourth Amendment rights were not implicated by the monitoring of the transmitter.

### b. *Stop and Search of the Malekula*

██ We agree with defendants that the Malekula was "seized" when it was intercepted by the Acushnet. *See United States v. Williams,* 617 F.2d 1063, 1071 n. 1 (5th Cir. 1980) (en banc). Defendants contend that this seizure was unlawful because U.S. Customs officials lack statutory authority to make seizures on the high seas, the Coast Guard acted beyond its authority, and the nighttime stop violated the Fourth Amendment.

██ We have not yet determined the appropriate remedy for a seizure not expressly authorized by statute. *See Peterson,* 812 F.2d at 492–93 (declining to decide issue). Relying on *United States v. Sarmiento,* 750 F.2d 1506 (11th Cir.1985), defendants argue that either the charges against them must be dismissed or the evidence suppressed when the seizure is unauthorized. It is not necessary, however, for us to decide that issue. We agree with the district court that the Coast Guard, not U.S. Customs, was responsible for the stop and seizure of the Malekula. *See Juda,* 797 F.Supp. at 776–77. The interception was made by a Coast Guard ship, and Coast Guard officers were in command at all times. DEA and Customs agents were on board but did not participate in the interception decisions. *See id.*

We reject defendants' contention that the Coast Guard acted beyond its authority. The Coast Guard is authorized by statute to "make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States." 14 U.S.C. § 89(a). Clearly, the Coast Guard is entitled to detain a foreign vessel while awaiting consent of the flag nation to the exercise of United States jurisdiction. *See Kahn*, 35 F.3d at 430 ("If the Coast Guard could not hold a suspected ship while waiting, the ship would have an opportunity to escape or to destroy evidence.").

Moreover, the Coast Guard was not required to believe Juda's statement that the Malekula was registered, but was entitled to "proceed to verify a foreign ship's right to fly its flag by examining its documents and, if necessary, by an examination on board the ship." Restatement Of the Foreign Relations Law of the United States (Third) § 522 comment b. In this case, Juda refused to allow boarding, and threatened to shoot at the Coast Guard's boat. Under these circumstances, we conclude that the Coast Guard was authorized to seize the Malekula.

Finally, defendants argue that the nighttime stop of the Malekula was unreasonable. *See United States v. Piner*, 608 F.2d 358, 361 (9th Cir.1979). In *Piner*, however, we held only that when officers seek to make a random safety and document check, a "stop and boarding after dark must be for cause, requiring at least a reasonable and articulable suspicion of noncompliance." *Id.* We agree with the district court's finding that "[t]he Coast Guard possessed reasonable suspicion that Malekula was carrying drugs in violation of U.S. laws." *Juda*, 797 F.Supp. at 784. Moreover, because the Coast Guard was relying on its experience that nighttime approaches to drug courier ships tend to trigger less violence, the nighttime stop was not unreasonable. Accordingly, we reject defendants' Fourth Amendment arguments.

3. *Van Der Hoeven's Challenge to His Sentence*

Van Der Hoeven contends that the district court erred in failing to rule on his objection to the presentence report regarding an adjustment for his alleged minor role in the offense. We reject his contention. Federal Rule of Criminal Procedure 32(c)(3)(D) requires that a district court make findings as to all disputed facts, or "a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing." Here, the court explained that it did not need to decide Van Der Hoeven's factual dispute, because it was granting the government's motion for a departure from the guidelines. There was no violation of Rule 32.

**AFFIRMED.**