UNITED STATES of America, Plaintiff,

v.

Wayne BIERMANN, Peter Malcolm Davis, Birgit Ursula King, and Steven Preston King, Defendants.

No. CR-87-0473-CAL.

United States District Court, N.D. California.

Feb. 9, 1988.

Leida S. Schoggen, Asst. U.S. Atty., San Francisco, Cal., for plaintiff.

Stephen J. Heiser, San Francisco, Cal., for Wayne Biermann.

Michael Stephanian, San Francisco, Cal., for Peter M. Davis.

Nancy Roscoe, San Francisco, Cal., for Birgit U. King.

William L. Osterhoudt, San Francisco, Cal., for Steven P. King.

## OPINION AND ORDER

LEGGE, District Judge.

This case involves the Coast Guard's search and seizure on the high seas of a vessel registered in the United Kingdom and operated by citizens of four different countries. The vessel contained several tons of marijuana and its occupants were indicted for possession of marijuana with intent to distribute it.

Defendants have moved for (1) dismissal of the indictment, on the ground of lack of jurisdiction; (2) suppression of the evidence which was obtained from the search and seizure of their vessel; (3) an evidentiary hearing on those motions; and, (4) the production of additional evidence by the government for the purpose of that evidentiary hearing. The government has opposed all of the motions.

By stipulation, this case has been designated as a complex case for purposes of the Speedy Trial Act, under 18 U.S.C. § 3161(h)(8)(B)(ii). The government has produced to defendants most of the discovery previously requested by them. Defendants then made these pending motions.

This court initially granted defendants' request for an evidentiary hearing. However, on the motion of the government, the court is reconsidering whether an evidentiary hearing is necessary and is addressing the legal issues raised by defendants' motions. The court has received supplemental briefs and declarations from defendants and the government. The court has reviewed the record, the moving and opposing papers, and the applicable authorities.

The court concludes, for the reasons of law discussed below, that defendants' motion to dismiss for lack of jurisdiction and motion for suppression of evidence must be denied. Because these rulings are made as a matter of law based upon the uncontested record, an evidentiary hearing is not necessary and the further production of evidence by the government is not necessary.

## I.

## FACTS

For purposes of this motion, the relevant facts are uncontested in the record.

The Myth of Ecurie ("Myth") is a sailing vessel registered in the United Kingdom and flying the flag of the United Kingdom. The boat's home port in the United Kingdom was displayed on the stern. One of the defendants is a United Kingdom citizen, one is a Bermuda citizen, one is a German citizen, and one is a United States citizen.

Defendants sailed the Myth from Hong Kong, across the Pacific to the west coast of the United States. On June 15, 1987 a United States Coast Guard cutter encountered the Myth about thirty-five nautical miles southwest of Point Reyes, California. The Myth was headed for San Francisco. Upon the approach of the cutter, the Myth's master and the Coast Guard engaged in radio conversation. The Coast Guard requested permission to conduct a consensual boarding of the Myth. The request was denied. The master of the Myth asserted that the Coast Guard had no jurisdiction, since the Myth was a boat of United Kingdom registry sailing in international waters.

The Coast Guard made certain observations about the Myth. Then apparently acting in compliance with procedures established in a 1981 agreement between the United States and the United Kingdom, the captain of the cutter requested from the government of the United Kingdom a statement that the United Kingdom did not object to the Coast Guard boarding the Myth. The United Kingdom replied by teletype that it would not object to the boarding, search and seizure of the Myth by the

Coast Guard under the terms of that agreement.

On June 16, the Coast Guard boarded the Myth. At the time of the boarding, the Myth was located over 100 miles west of the California coast. The Coast Guard boarding officer smelled marijuana when he came aboard the Myth. The master of the Myth and boarding officer went below to obtain any weapons. The boarding officer there saw numerous bails of material in plain view and noticed the heavy smell of marijuana. When the boarding officer asked the master what was in the bails, the master replied that it was marijuana. The Myth and defendants were then brought to the Coast Guard station on Yerba Buena Island in San Francisco Bay and were placed under arrest. The marijuana aboard the Myth totaled over 7,000 pounds, stored in 236 bails.

While certain other evidence regarding the Myth, the cutter, and the dealings between them are in dispute and are mentioned later, those disputes need not be resolved for purposes of ruling upon defendants' motions. The above record is uncontested and is all that is necessary for the rulings of law on jurisdiction and suppression.

## II.

### INDICTMENT

On June 24, 1987 a federal grand jury indicted defendants. Count one charges a violation of 46 U.S.C. § 1903(a), the knowing and intentional possession, with the intent to distribute, of in excess of three tons of marijuana. Count two charges a violation of 46 U.S.C. § 1903(j), a combination, conspiracy and agreement among defendants and others to possess marijuana with the intent to distribute it. The indictment does not charge defendants with importation or the intent to import.

## III.

### MOTIONS

Defendants' principal motion is that the indictment should be dismissed for lack of jurisdiction. Their argument is that those criminal statutes of the United States cannot apply to persons on foreign vessels outside of the territory of the United States.

Defendants also move to suppress the evidence obtained from the search and seizure of the Myth. Their arguments in that regard are primarily two. One is that the Coast Guard's request to the United Kingdom for permission to board and search the Myth was not in compliance with the 1981 agreement between the United States and the United Kingdom. The second is that the search and seizure were in violation of the Fourth Amendment of the United States Constitution. As stated, defendants also request an evidentiary hearing on those issues and have requested the further production of evidence by the government in that regard.

The court will discuss each of those issues in order.

## IV.

### JURISDICTION UNDER THE APPLICABLE STATUTES

Do these criminal statutes of the United States, 46 U.S.C. § 1903(a) and (j), apply to persons on a foreign flag vessel in international waters?

46 U.S.C. § 1903 is part of Chapter 38 of the Shipping Code. That chapter expressly deals with *"Maritime* Drug Law Enforcement." (emphasis added). The statute was originally passed in 1980, then as Section 955c of Title 21, regarding food and drugs. The section was enacted to fill a void left by the Comprehensive Drug Abuse Prevention and Control Act of 1970, which superseded prior drug enforcement legislation but inadvertently omitted to replace the provision under which drug offenders apprehended on the high seas were prosecuted. *See* S.Rep. No. 855, 96th Cong., 2d Sess., *reprinted in* 1980 U.S. Code Cong. & Admin.News 2785.

The section was amended in 1986 and restated as Section 1903 of the Shipping Code. The Senate Report pertaining to that amendment stated that, under the

statute before its amendment, some defendants had successfully resisted prosecution by "relying heavily on international jurisdictional questions as legal technicalities." S.Rep. No. 530, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News 5986, 6000. The amendment therefore included a provision prohibiting individual defendants from relying as a defense on the government's failure to comply with international law.

In 46 U.S.C. § 1902 Congress specifically found and declared

> that trafficking in controlled substances aboard vessels is a serious international problem and is universally condemned. Moreover, such trafficking presents a specific threat to the security and societal well-being of the United States.

It is clear from the language of Section 1903 that Congress intended to apply that penal statute not only to a United States flag vessel, but also to any vessel subject to the jurisdiction of the United States. Section 1903(a), the offense charged in count one of this indictment, provides that

> It is unlawful for any person on board a vessel of the United States, or on board *a vessel subject to the jurisdiction of the United States,* to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance. (emphasis added).

In subsection (c)(1) Congress specifically defined a "vessel subject to the jurisdiction of the United States" as including:

> (C) a vessel registered in a foreign nation where the flag nation has consented or waived objection to enforcement of United States law by the United States;
>
> (D) a vessel located within the customs waters of the United States.

The term "customs waters" is defined in 19 U.S.C. § 1401(j)[1] to mean

> in the case of a foreign vessel subject to a treaty or other arrangement between a foreign government and the United States enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce upon such vessel upon the high seas the laws of the United States, the waters within such distance of the coast of the United States as the said authorities are or may be so enabled or permitted by such treaty or arrangement ...

Thus, the term includes the location of any vessel upon the high seas, so long as the United States government has obtained authorization, by way of treaty or other arrangement, from the vessel's flag nation.

Section 1903(j), the offense charged in count two of this indictment, also makes conspiracy to commit any offense defined by the chapter a crime.

The government asserts jurisdiction over the Myth and defendants under both subsections (C) and (D) of Section 1903(c)(1). Has the United Kingdom "consented or waived objection to enforcement of United States law by the United States," under subsection (C)? Was the Myth subject to a treaty or other arrangement between the United States and the United Kingdom enabling the United States to board, examine, search, seize, or otherwise enforce the laws of the United States on the high seas, under subsection (D) and 19 U.S.C. § 1401(j)?

The answer to these questions initially involves reference to the 1981 agreement between the United States and the United Kingdom. Defendants contend that the terms of the 1981 agreement were not followed, because in requesting the United Kingdom's consent to board the Myth, the Coast Guard did not have a "reasonable belief" that the Myth was engaged in drug importation into the United States. The government disagrees. But more important to this motion, the government also contends that, even apart from the terms of the 1981 agreement, the consent given by the United Kingdom to the Coast Guard for the boarding of the Myth constituted an

---

**1.** 19 U.S.C. § 1401(j) is an administrative provision of the Tariff Act of 1930. An identical definition of the phrase "customs waters" can be found in Chapter 5 of Title 19, which relates to the enforcement of smuggling laws. 19 U.S.C. § 1709(c). For the sake of convenience this opinion will refer to § 1401(j).

"arrangement" which brought the Myth within the customs waters of the United States under subsection D, and that the United Kingdom hereby "consented" or "waived objection" under subsection C.

The agreement between the United Kingdom and the United States is set forth in an exchange of notes on November 13, 1981. The notes state that their purpose is "to take more effective measures to suppress the unlawful importation of cannabis and other narcotic drugs into the United States." The British government acknowledged its regard for the need for international cooperation in suppressing the illicit traffic in narcotic drugs. The operative language of the agreement is that the United Kingdom

> will not object to the boarding by the authorities of the United States, outside the limits of the territorial sea and contiguous zone of the United States ... of private vessels under the British flag in any case in which those authorities reasonably believe that the vessel has on board a cargo of drugs for importation into the United States....

Certain other substantive and procedural matters are set forth in the agreement. And it is important to note that there is no requirement in the agreement for the advance consent by the United Kingdom to any particular boarding.

It is questionable whether that agreement applies to this case. The agreement, in paragraph nine, defines the geographic areas in which the agreement is applicable. That definition does not include the waters of the Pacific Ocean. However, in this case the Coast Guard did request the consent of the United Kingdom to board the Myth. And in its reply telex, the United Kingdom gave its consent under the terms and conditions of the agreement.[2]

Assuming that the agreement applies to this case, defendants argue that its terms were not complied with because the Coast Guard did not have a "reasonable belief" that the Myth was importing drugs into the United States at the time of requesting the United Kingdom's consent. It is primarily on this issue that defendants request an evidentiary hearing. Defendants also argue that the 1981 agreement only covers *importation* offenses. However, it is the conclusion of this court that defendants lack standing to raise either of these issues.

First, the 1981 agreement sets forth in paragraphs four, five, seven, and eight the procedures and remedies. Those remedies refer only to rights and duties of the United Kingdom and the United States, and do not contain any inference that any private party has standing to object to actions of the United States or the United Kingdom under that agreement. Second, 46 U.S.C. § 1903(d) also indicates that defendants have no standing to object to any alleged deficiencies. That section states:

> A claim of failure to comply with international law in the enforcement of this chapter may be invoked solely by a foreign nation, and a failure to comply with international law shall not divest a court of jurisdiction or otherwise constitute a defense to any proceeding under this chapter.

Third, the legislative history of Section 1903 clearly shows that Congress intended to foreclose the type of arguments that defendants seek to make here. The Senate Report notes that, under prior law,

> defendants have been insisting at trial that the government present judicially admissible documentary evidence from the affected foreign nation to prove consent or denial of a claim of registry. These tactics have met with varying suc-

---

**2.** The telex said:

"1. HMG HAS VERIFIED REGISTRY OF SUBJ VESSEL AND HAS AUTHORIZED USG TO BOARD, SEARCH AND SEIZE, IF EVIDENCE WARRENTS, UNDER U.S. LAW. HMG HAS INDICATED THAT THE CONDITIONS AND TERMS CONTAINED IN 13 NOV 81 US/UK AGREEMENT WILL BE USED IN THIS CASE.

2. IN VIEW OF THE ABOVE, COMDT HAS NO OBJECTION TO TAKING ACTION AGAINST SUBJ VESSEL UNDER THE TERMS OF THE US/UK AGREEMENT.

3. INSURE AMENBASSY LONDON IS INFO ADDEE ON ALL RELATED MSC TRAFFIC."

cess, depending on the court. But prosecutors have had to go to great lengths to protect their cases from the possibility of an adverse ruling. . . .

In the view of the Committee, only the flag nation of a vessel should have a right to question whether the Coast Guard has boarded that vessel with the required consent. The international law of jurisdiction is an issue between sovereign nations. Drug smuggling is universally recognized criminal behavior, and defendants should not be allowed to inject these collateral issues into their trials.

S.Rep. 530, 99th Cong., 2d Sess. 15–16, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5986, 6000–01.

Finally, defendants' lack of standing here is also consistent with a recent decision of the United States Court of Appeals for the Ninth Circuit. In *United States v. Peterson*, 812 F.2d 486 (9th Cir.1987), the court was concerned with Section 955, the predecessor to Section 1903. The defendants there contended that the boarding of their ship violated their rights under international law. The Ninth Circuit denied that contention and held that the treaty involved there did not confer any rights on the litigants to suppress the evidence. The court said (page 492):

The ramifications of a violation of international law are largely political, and any violation of international law here is only relevant as it informs our decision on whether the search was or was not in violations of our statutory and constitutional standards. The treaty is not self-executing in the sense that it confers individual rights on these litigants to suppress evidence. If the search was properly authorized, a violation of the treaty would not allow for exclusion of the evidence. *See U.S. v. Williams*, 617 F.2d 1063, 1089–90 (5th Cir.1980). In any event, as we discuss below, Panama's consent [to the boarding] removes international law concerns from the case.

*See also U.S. v. Bent–Santana*, 774 F.2d 1545, 1550 (11th Cir.1985); *U.S. v. Hensel*, 699 F.2d 18, 30 (1st Cir.1983).

This court concludes that it is unclear whether the Coast Guard was bound by the requirements of the 1981 agreement in requesting permission to board and seize the Myth. But even if those requirements were applicable because of the United Kingdom's reply, and even if the Coast Guard did not comply with them, only the government of the United Kingdom—and not these defendants—has the right to object.

■ The reach of the criminal statutes charged here is therefore governed by the language of subsections (C) and (D) of Section 1903(c)(1). The court concludes that under subsection (C) the United Kingdom expressly "consented or waived objection to enforcement of United States law by the United States;" and that under subsection (D) the Myth was located within· the customs waters of the United States, as defined by 19 U.S.C. § 1401(j) because there was an "arrangement" with the United Kingdom enabling authorities of the United States to "board, examine, search, seize and otherwise enforce upon the high seas the laws of the United States." *U.S. v. Peterson*, 812 F.2d at 493, held that the consent of a foreign government brought the boarding of a ship within the customs waters of the United States.

In boarding the Myth, the Coast Guard was also acting under the statutory authority of 14 U.S.C. § 89(a). That section provides in relevant part that "The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States." And the Coast Guard "may at any time go aboard any vessel subject to the jurisdiction, or to the operation of any law, of the United States."

The Fifth Circuit in *United States v. Williams*, 617 F.2d 1063, 1076 (5th Cir. 1980), held that Section 89(a) requires that the Coast Guard must act upon reasonable suspicion when it relies on the jurisdictional predicate that a foreign vessel on the high seas is operating in violation of U.S. laws.

This holding was noted by the Ninth Circuit in *U.S. v. Peterson,* 812 F.2d at 493. But the *Peterson* court stated that Section 89(a), in the context of enforcing the statutory predecessor of 46 U.S.C. § 1903, "specifically applies to the high seas and does not restrict the Coast Guard to actions based on reasonable suspicion or probable cause." *Id.* The Ninth Circuit, however, avoided a direct conflict with the Fifth Circuit by holding that the search in *Peterson* was conducted pursuant to a different jurisdictional predicate, *i.e.* that the vessel was boarded within the customs waters of the United States. *Id.* As this court has already discussed above, the Myth was also located in the customs waters of the United States within the definition of the applicable statutes.

This court therefore concludes that: the Myth was in the customs waters of the United States; the Coast Guard had authority to board the Myth without reasonable suspicion or probable cause under 14 U.S.C. § 89(a); the Myth and defendants are subject to United States jurisdiction under 46 U.S.C. § 1903(c)(1)(C) and (D); and 46 U.S.C. § 1903(a) and (j) do apply to the Myth and to defendants. That extension of jurisdiction is just what the U.S. Congress and the United Kingdom intended.

## V.

## JURISDICTIONAL LIMITATIONS UNDER THE CONSTITUTION

Defendants then contend that such an extension of the statutes of the United States to international waters, even with the consent of a foreign government, is an unconstitutional exercise of extraterritorial jurisdiction. Defendants argue that the U.S. Constitution, together with judicially developed doctrines of jurisdiction, preclude application of substantive United States criminal law to persons on foreign vessels outside of United States territory.

The constitutionality of Section 1903's predecessor statute, 21 U.S.C. § 955c, has been upheld by several federal courts of appeal. *See United States v. Peterson,* 812 F.2d 486 (9th Cir.1987); *United States v. Romero–Galue,* 757 F.2d 1147 (11th Cir. 1985). The constitutional analysis in such cases begins with the proposition, discussed above, that in enacting Section 1903 Congress intended to assert jurisdiction to the maximum extent allowable under international law.

As a general matter, international law prohibits any country from asserting jurisdiction over foreign vessels on the high seas. *See United States v. Marino–Garcia,* 679 F.2d 1373, 1380 (11th Cir.1982). Defendants concede that this general rule does not apply if a "sufficient nexus" indicates that acts aboard the foreign vessel are likely to have criminal consequences within the United States. *See Peterson,* 812 F.2d at 493; Restatement (Second) of Foreign Relations § 18. However, defendants argue that this exception is not present here, because the United States has not charged defendants with conspiracy to import a controlled substance, *see* 21 U.S.C. § 963, but rather has proceeded under Section 1903, which proscribes conspiracy and possession with intent to distribute. Whether the facts necessary to establish jurisdiction must also be the basis for the criminal violation ultimately charged, and whether those facts exist in this case, are however questions which need not be answered here. Rather, this court is of the opinion that established principles of protective jurisdiction support the extraterritorial reach of Section 1903.

The protective principle recognizes that a nation may assert jurisdiction over foreign vessels on the high seas that threaten its security or governmental functions, without the requirement of demonstrating an actual effect on the nation itself. *See Peterson,* 812 F.2d at 493–94; Restatement (Second) of Foreign Relations § 33 ("A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct outside its territory that threatens its security as a state or the operation of its governmental functions, provided the conduct is generally recognized as a crime under the law of states that have reasonably developed legal systems."). Congress

has specifically found "that trafficking in controlled substances aboard vessels is a serious international problem and is universally condemned. Moreover, such trafficking presents a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 1902. The Ninth Circuit agreed in *U.S. v. Peterson*, 812 F.2d at 493–94.

■ International law is merely an aid to statutory interpretation; it does not create limitations on congressional power. In interpreting a statute, it is this court's duty to ascertain and give effect to the intent of the legislature. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). The congressional intent behind Section 1903 does reflect principles of international law. However, international law itself is not binding on Congress, which remains free to legislate with respect to extraterritorial conduct subject only to the limitations of the U.S. Constitution. *Rainey v. United States*, 232 U.S. 310, 316–17, 34 S.Ct. 429, 431, 58 L.Ed. 617 (1914); *United States v. Pinto–Mejia*, 720 F.2d 248, 259 (2d Cir.1983).

■ Article one, section 8, clause 10 of the U.S. Constitution specifically confers upon Congress the power "To define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." The courts of the United States have not had many occasions to interpret this constitutional provision. However, this provision clearly and unambiguously grants to Congress the power to *define* felonies committed upon the high seas, and this is precisely what Congress has done in enacting Section 1903. This power of Congress supplements the grant of judicial jurisdiction over "all cases of admiralty and maritime jurisdiction." Article III, Section 2, Clause 1. *See United States v. Flores*, 289 U.S. 137, 149, 53 S.Ct. 580, 582, 77 L.Ed. 1086 (1933).

This court concludes that Section 1903 may constitutionally be applied to the boarding, seizure, and arrest of the Myth and defendants.

## VI.

## FOURTH AMENDMENT

Defendants also move to suppress the evidence obtained in the seizure of the Myth, arguing that it was illegally and unconstitutionally obtained. This motion challenges (1) the scope of the Coast Guard's authority to stop and search the Myth, and (2) the constitutionality of the search under the Fourth Amendment.

The Coast Guard's authority to stop and search the Myth derives from statute and from the agreement between the governments of the United States and the United Kingdom. This court has already concluded that the Coast Guard acted according to the statutory authorization of 14 U.S.C. § 89(a), and that such a stop and search does not require reasonable suspicion or probable cause. *U.S. v. Peterson*, 812 F.2d at 493. This court has also concluded that defendants lack standing to raise issues pertaining to the arrangements between the United States and the United Kingdom.

Therefore, the remaining issue is whether the search and seizure violated the Fourth Amendment. There is initially a serious question as to whether Fourth Amendment protections extend to the high seas. The Ninth Circuit said in *U.S. v. Peterson* that "[w]hile neither the Supreme Court nor this court has stated definitively the extent to which fourth amendment protections apply upon the high seas, it has been assumed to apply in our major decisions." 812 F.2d at 489 (citations omitted). The court expressly noted that it "is far from settled" whether the Fourth Amendment is fully applicable on the high seas. It was unnecessary to decide that issue in *Peterson*, because the court found that the Coast Guard had probable cause to stop, board, search, and seize the vessel at issue there, and probable cause is the highest level of suspicion that could be required if the Fourth Amendment were fully applicable. *Id.* This court will assume here that the Fourth Amendment does apply in this case.

■ The Fourth Amendment by its terms prohibits *unreasonable* searches and

seizures. The Supreme Court has held that this provision protects an individual's reasonable expectation of privacy from certain kinds of governmental intrusion. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The preferable method of protecting this privacy interest is to require the government to obtain a warrant before conducting a search. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, under certain circumstances it is not reasonable to require law enforcement officials to obtain a prior warrant, and courts have upheld warrantless searches so long as the officers had probable cause to believe the search would yield evidence of crime, or if the search was necessary to ensure the safety of the officers or public. *See Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970) (search of vehicle after police witnessed drug transaction between its occupants). In still other circumstances, courts have upheld searches based on less than probable cause, without regard to officer or public safety, if the search satisfies a "balancing test," weighing protected privacy interests against legitimate governmental interests. *See United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). These circumstances have usually involved law enforcement at the nation's borders or their functional equivalent, where the volume of activity is heavy, and requiring a high level of particularized suspicion would be unrealistic. *See United States v. Matinez–Fuerte,* 428 U.S. 543, 557, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976).

In *United States v. Villamonte–Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), the Supreme Court upheld customs officials' warrantless, suspicionless boarding of a vessel in waters with ready access to the open seas, when the officials acted pursuant to statutory authority for the purpose of inspecting the ship's documents. The Supreme Court relied heavily on the fact that the statute which authorized the search was the "lineal descendant" of a statute enacted by the Congress that framed the Fourth Amendment. The Court also found that the

government had a strong interest in ensuring compliance with documentation and customs laws, and that the intrusion involved—boarding the deck and "public areas" of the vessel—was slight. *Id.* at 592, 103 S.Ct. at 2541.

The Ninth Circuit has stated, in a context similar to that presented by this case, that "a minimal intrusion on protected privacy interests is measured by the balancing test, but a substantial intrusion ... must satisfy the probable cause requirement of the Fourth Amendment." *United States v. Humphrey,* 759 F.2d 743, 746 n. 2 (9th Cir.1985). The Ninth Circuit has directly held that there is no legitimate expectation of privacy in the cargo hold of a vessel, *Peterson,* 812 F.2d at 494, and that the intrusion of entry on the publicly exposed deck area is minimal. *Humphrey,* 759 F.2d at 746.

The Ninth Circuit in *Humphrey* and the Supreme Court in *Villamonte–Marquez,* concluded that government officials needed neither reasonable suspicion nor a warrant before conducting the particular searches at issue there. These conclusions reflect the strength of the governmental interests, balanced against the relatively slight intrusion on individual interests in cases of boats on the high seas.

The governmental interests are well defined by Congress. They are stated by Congress in 46 U.S.C. § 1902, in Section 2015 of Pub.L. 99–570, and in the 1981 agreement between the United States and the United Kingdom. Other often cited governmental interests on the high seas include safety and document inspections.

In balancing those governmental interests against intrusion on individuals' Fourth Amendment interests, courts have consistently found the governmental interests to be greater than any intrusions on individuals who are on vessels at sea. Research has not disclosed any case where the search and seizure of a vessel was held to violate the Fourth Amendment if it did not violate or exceed some statutory authority. To the contrary, the reported cases have upheld searches on the high

seas and have balanced the interests in favor of the governmental concerns. Those decisions include ones by the United States Supreme Court in *Villamonte–Marquez*, and the Ninth Circuit in *Humphrey* and *Peterson*. Those conclusions are particularly appropriate here, in light of both the broad principle of jurisdiction which is present and the strongly stated congressional objective.[3]

While the principles of *Villamonte–Marquez*, *Humphrey* and *Peterson* apply to this case, the inquiry cannot end there. The reason is that those cases were in part fact-specific, and the facts in this case are somewhat different. The principal difference is that there is no evidence in the record here that the boarding of the Myth was for the purposes of safety or document inspection. Indeed, the record indicates that the Myth was intercepted and boarded because the Coast Guard suspected that the Myth was carrying drugs. Does this difference in the facts change the conclusions reached in the above cases? This court thinks not.

The court first notes that the Coast Guard acted under the very broad boarding power given to it by Congress in 14 U.S.C. § 89(a), which power is not limited to safety and documents inspections. And obtaining the prior consent of the United Kingdom also acted as a restraint on any unfettered exercise of enforcement power over the Myth and defendants. This court need not here define what, or whether any, cause or suspicion is required by the Fourth Amendment for searches on the high seas. Such a definition is better left to an appellate court. Rather, in applying the balancing standard required by the Fourth Amendment, and determining whether the search and seizure were reasonable here, this court believes that the facts uphold the validity of the search and seizure under any standard.

The uncontested and relevant facts have been discussed above. In addition, according to the declaration of the Coast Guard, the Myth was in an area where such sailboats are not usually seen. It was headed toward San Francisco. It was on a list of the El Paso Intelligence Center as a vessel suspected of narcotics trafficking. According to the Coast Guard's declaration, the bow of the Myth was riding very low in the water, indicating that cargo was on board. And the Myth altered course after being encountered by the Coast Guard. Most of the facts are not challenged by defendants, either by declarations or in their request for an evidentiary hearing. But even if defendants were to present evidence and successfully challenge the accuracy of some of the Coast Guard's observations, the undisputed facts in the record compel the conclusion that the Fourth Amendment was not violated in the boarding of the Myth, under the principles of *Villamonte–Marquez*, *Humphrey* and *Peterson*.

Further, the undisputed facts demonstrate that upon the boarding of the Myth, there was no Fourth Amendment violation in the further search of the vessel. It is undisputed that the Coast Guard boarding party could smell marijuana. The boarding party asked about the presence of weapons, and when the master replied affirmatively, he and the boarding officer went below. The Coast Guard officer saw marijuana in plain view, and the master admitted that the cargo was marijuana. *See United States v. Cilley*, 785 F.2d 651 (9th Cir.1985); *United States v. Humphrey*, 759 F.2d 743 (9th Cir.1985).

## VII.

### ORDER

For the reasons stated above [4] the court grants the government's motion for reconsideration of an evidentiary hearing, and ORDERS as follows:

1. Defendants' motion to dismiss the indictment for lack of jurisdiction is denied.

---

3. *U.S. v. Williams*, 617 F.2d at 1081, stated that the constitutionality of a particular search should be considered in the light of the statute and other authority that permitted it.

4. The court acknowledges the assistance of J. Daniel Sharp and Laurie Kullby in the preparation of this opinion.

2. Defendants' motion for suppression of evidence obtained from the boarding, search, and seizure of the Myth Ecurie is denied.

3. Defendants' request for an evidentiary hearing on the above issues is denied.

4. Defendants' request for the production of further evidence for purposes of that requested hearing is denied.

5. Any further pretrial motions by defendants shall be filed by March 11, 1988.

6. The pretrial conference is scheduled for April 21, 1988, at 3:30 p.m.

7. The trial is set for May 9, 1988, at 9:00 a.m.