UNITED STATES of America, Plaintiff,

v.

Olaf JUDA, et al., Defendants.

No. CR–91–0324–CAL.

United States District Court,
N.D. California.

June 11, 1992.

Dennis Michael Nerney, Asst. U.S. Atty., Office of U.S. Atty., San Francisco, Cal., for plaintiff.

Joseph T. Vodnoy, Los Angeles, Cal., for defendant Juda.

Judd C. Iversen, Judd C. Iversen Law Offices, San Francisco, Cal., for defendant Burg.

Oscar Arroyave, Miami, Fla., for defendant Paris.

Gilbert Eisenberg, San Francisco, Cal., for defendant Missell.

Michael J. Osman, Miami, Fla., for defendant Van Der Hoeven.

Joseph F. Walsh, Los Angeles, Cal., for defendant Avila.

## OPINION AND ORDER ON MOTIONS

LEGGE, District Judge.

Defendants have filed motions which present issues about unsettled areas of law; that is, the constitutional authority of the United States to investigate, intercept and prosecute drug activities occurring outside the United States.

### I.

The six defendants in this case were on board a vessel, the Malekula, headed from Southeast Asia to Canada. As a result of extensive international cooperation and investigative work, Malekula was intercepted in international waters off the coast of Canada by a United States Coast Guard ship. Defendants' vessel was loaded with hashish. When Malekula was intercepted by the Coast Guard, it was set on fire—allegedly by one of the defendants. Defendants abandoned the vessel and were rescued by the Coast Guard; the Coast Guard also retrieved some of the cargo of hashish.

Defendants were arrested and this indictment was brought against them in this court. All six defendants are charged with violations of 46 U.S.C.App. § 1903(a) (persons on board a vessel possessing a controlled substance with intent to distribute), and 46 U.S.C.App. § 1903(j) (conspiracy to commit that offense). Defendants Juda and Van Der Hoeven are also charged with assault and arson arising from the interception of Malekula by the Coast Guard.

### II.

Defendants move to dismiss the indictment on the ground of lack of jurisdiction. In the event that motion is unsuccessful, defendants also move to suppress the evidence resulting from an alleged illegal entry onto Malekula, which occurred in a foreign country and which resulted in a beeper being placed in the vessel. An evidentiary hearing was held on the motions and they have been submitted for decision.

### III.

■ One ground for the motion to dismiss is that the interception of Malekula was allegedly done by United States Customs and the Drug Enforcement Administration (DEA), and not by the Coast Guard. The significance of that distinction is based upon *United States v. Sarmiento,* 750 F.2d 1506 (11th Cir.1985). In that case, customs officers boarded a vessel, seized the cargo and made arrests on the high seas. The district court dismissed the indictment, and the dismissal was affirmed on appeal. The dismissal was upon the ground that the acts of United States Customs were in violation of the jurisdictional statutes granting authority to that agency; 19 U.S.C. §§ 1581(a) and 1401(j).

However, defendants' motion here must be denied for both legal and factual reasons. The *Sarmiento* decision dealt only with the powers of United States Customs; but as the opinion indicates, there is *separate* statutory authority granted to the United States Coast Guard, 14 U.S.C. § 89(a); 750 F.2d at 1507. In a decision of this circuit, *United States v. Aikins,* 923 F.2d 650 (9th Cir.1990), the arrest was a combined operation of United States Customs, the DEA and the Coast Guard; but the court of appeals did not upset the conviction because of the participation of Customs or DEA. *Id.* at 652–53.

Even if the law in this circuit were the same as asserted by the defendants in *Sarmiento*, the facts here are not the same. The court has reviewed the written and oral versions of the tapes made during the interception of Malekula. The interception was done by a Coast Guard ship, and the Coast Guard was in command of the interception. DEA and Customs officers were aboard, and they did participate in the activities. One Customs agent had been an undercover agent having contact with one or more of the defendants. It was therefore natural for him to have a role in communicating with defendants at the time of the interception. The only contacts between the Coast Guard ship and Malekula were by sight and by radio. Defendants' vessel was set afire before defendants were asked for their consent to be boarded, or were told whether they would be forcibly boarded. As soon as Malekula caught fire, the object of the interception became the rescue of the crew, and if possible the vessel and its cargo.

The court finds as a matter of fact, by a preponderance of the evidence, that the interception was under the control of the Coast Guard. The Coast Guard was statutorily authorized to do so. The court therefore denies defendants' motion to dismiss the indictment on the ground that the operation was conducted by United States Customs outside the scope of the statutory jurisdiction of that agency.

### IV.

The other ground for defendants' motion to dismiss is more substantial. That is, is it a violation of due process for the United States to prosecute defendants since they were on a vessel in international waters headed for a foreign country? Defendants contend that the due process clause of the constitution requires a nexus between their activities and the United States, and that the required nexus must be that the hashish be destined for the United States.

### A.

Several decisions in this circuit, including a decision of this court, have considered variations on this issue. *United States v. Aikins*, 923 F.2d 650 (9th Cir.1990); *United States v. Davis*, 905 F.2d 245 (9th Cir.1990); *United States v. Peterson*, 812 F.2d 486 (9th Cir.1987); *United States v. Biermann*, 678 F.Supp. 1437 (N.D.Cal.1988). A brief discussion of the development of the law by these cases is necessary to the conclusions which this court states below.

In *United States v. Peterson*, the Ninth Circuit discussed the so-called protective principle of jurisdiction, as a constitutional basis for exercising jurisdiction over defendants in international waters without any showing of an actual effect on the United States. 812 F.2d at 493–94. In reliance on the discussion in *Peterson*, this court in *United States v. Biermann*, considered the defendants' arguments regarding nexus, but concluded that a showing of nexus was not required because jurisdiction could constitutionally be exercised under the protective principle. 678 F.Supp. at p. 1444. However, in *United States v. Davis*, the appeal of the *Biermann* case, the Ninth Circuit held that due process required a nexus. And the court found nexus primarily from evidence of the intention of the defendants to bring the drugs into the United States. In *United States v. Aikins*, this circuit followed *Davis*, reaffirmed the requirement of a nexus, and found nexus because the marijuana was destined for the United States. 923 F.2d at 655.

Based upon the *Davis* court's discussion on pp. 248–49, and particularly footnote 2, this court concludes that the circuit has rejected the protective principle discussed in *Peterson* and *Biermann* as being an independent ground for jurisdiction, and instead requires a constitutionally sufficient nexus.

Article I, Section VIII, clause 10 of the constitution does give congress the power to "define and punish ... felonies on the high seas." And by enacting Section 1903(a), congress exercised that power and intended that the United States' drug laws apply in international waters. *Davis*, 905 F.2d at 248. However, in order for Section 1903 to be applied to a particular vessel or a particular defendant, the decisions of this

circuit require a nexus between the defendant and the United States.

## B.

The government seeks to avoid the requirement of nexus on the ground that Malekula was a "stateless" vessel. The government argues that occupants of stateless vessels may be prosecuted by any country, without any requirement of nexus with the prosecuting country.

Malekula was owned and captained by defendant Juda. At the time of acquiring the vessel, he made several attempts to register it in foreign jurisdictions. However, those attempts were unsuccessful. During its voyage to Canada and at the time of the interception, Malekula was a "stateless" vessel.

There is some authority for the government's argument that nexus is not required between a stateless vessel and the country seeking to exercise jurisdiction. In *United States v. Rubies*, 612 F.2d 397, 403 (9th Cir.1979), the Ninth Circuit said, "with regard to stateless vessels, no question of comity nor of any breach of international law can arise, if there is no state under whose flag the vessel sails." However, that decision only goes so far. That is, the court was discussing comity and rules of international law; it was not considering the requirements of the United States Constitution. Even if stateless vessels are ones as to which the United States owes no obligations to another country, that does not mean that persons on those vessels do not have the protection of the constitution in a prosecution by the United States.

Decisions of other circuits have noted that distinction. In *United States v. Batista*, 731 F.2d 765 (11th Cir.1984), the Eleventh Circuit stated that there need not be a nexus between a stateless vessel and the country seeking to exercise its jurisdiction. However, the issue of due process under the United States Constitution was not raised. Accord, *United States v. Marino–Garcia*, 679 F.2d 1373 (11th Cir.1982). In *United States v. Alvarez–Mena*, 765 F.2d 1259 (5th Cir.1985), the Fifth Circuit held that no nexus was required by statute or

international law. The court discussed only international law and congressional intent, and noted that there was no basis for a claim of due process violation in that case. *Id.* at 1266. In *United States v. Pinto–Mejia*, 720 F.2d 248 (2d Cir.1983), the Second Circuit held that no nexus was required for the assertion of jurisdiction over a stateless vessel under international law. That court recognized that congress has the power to legislate in excess of the jurisdiction defined by international law. When Congress changed former 21 U.S.C. § 955a into the present 46 U.S.C.App. § 1903, it added a provision that the failure to comply with international law should not divest a court of jurisdiction. Section 1903(d). But the court also noted that a federal court would not be bound to follow that congressional direction if "this would violate the due process clause of the Fifth Amendment." 720 F.2d at 259. And in *United States v. Howard–Arias*, 679 F.2d 363 (4th Cir.1982), the Fourth Circuit held that stateless vessels were not protected by international law, and would be governed by federal statutes "to the extent permitted by the due process clause of the Fifth Amendment." 679 F.2d at 371. In summary, the above cases dealt only with principles of statutory construction and international law. They were not decisions on the extent that United States criminal laws can be applied as a matter of due process.

In contrast, the holdings of the Ninth Circuit in *Davis* and *Aikins*, and perhaps in *Peterson*, were not limited to international law considerations. Those decisions were constitutional in nature; that is, defining the constitutionally permissible scope of acts of congress over international waters.

■ This court therefore concludes that the constitutional requirement of nexus applies to stateless vessels. While such vessels may have no rights to object to jurisdiction under international law, the due process clause of the Fifth Amendment, as interpreted by the Ninth Circuit, requires a sufficient nexus between defendants and the United States for the United States to prosecute them.

## C.

█ What is the nexus that is required? In the *Davis* and *Aikins* cases, the drugs were bound for the United States and the court of appeals determined that was a sufficient nexus. However that nexus is absent in this case. The declarations, including those of defendants and the United States, demonstrate that the drugs were bound for Canada. There is no substantial evidence that the drugs were destined, even ultimately, for the United States. If the only permissible nexus is that the drugs be destined for the United States, there is an absence of nexus in this case.

Can there be connections between defendants and the United States, other than the intended destination of the drugs, which are a constitutionally sufficient nexus?

Malekula was owned and captained by defendant Juda, a citizen of the United States. Five of the six defendants aboard Malekula were United States citizens or resident aliens of the United States. There was a federal investigation of Juda in 1988 and 1989 for an alleged drug importation into the United States. Juda was indicted in the United States District Court in Oregon in June 1990, and a warrant was issued for his arrest but was apparently never executed. The vessel was purchased outside of this country, but the arrangements, including some of the financing arrangements, for the purchase were made in the United States. Juda made several trips in and out of the United States while arranging for the acquisition of the vessel and the crew, and the transportation of the hashish. There were meetings and calls in the United States between Juda and the undercover agent, and between Juda and the crew members. Juda maintained a substantial bank account and a safety deposit box in the United States, which allegedly included money for this shipment.

The reported decisions do not offer much guidance on what nexus is sufficient. In *United States v. Wright–Barker*, 784 F.2d 161 (3rd Circuit 1986), *United States v. Loalza–Vasquez*, 735 F.2d 153 (5th Circuit 1984), and *United States v. Angola*, 514 F.Supp. 933 (S.D. Florida 1981), the ships were intercepted under circumstances from which it could be inferred, even in absence of direct evidence, that the drugs might be redistributed into the United States. The government cites two additional cases, *Blackmer v. United States*, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932) and *Steele v. Bulova Watch Co.*, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952), in which the Supreme Court upheld the application of American law to the activities of United States citizens outside the United States. Again however, it appears that the activities in those cases were destined to have some impact within the United States.

This court concludes that the above mentioned connections between the United States and defendants and their vessel are a sufficient nexus to support the constitutional application of United States laws. The contacts with the United States were substantial, and indeed it appears that the transaction was essentially organized in the United States. The basic requirements for a constitutional exercise of jurisdiction are minimal contacts meeting a basic test of fairness. *Davis*, 905 F.2d at 249 & n. 2. *See also, International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (exercise of personal jurisdiction over defendant consistent with due process requires minimum contacts with territory of forum such that maintenance of suit does not offend traditional notions of fair play and substantial justice). This court believes that the required contacts are present in this case.

A case could be hypothesized where it would be unfair to prosecute a United States citizen, in the United States and under United States law, for something done entirely overseas. But this is not that case. The offense involved, the international importation of narcotics, is not just a creature of United States law or an offense peculiar to only a few countries. It is unlawful in virtually all countries. The constitution does not require that the United States be a safe haven for the planning of international crimes, just so long as the crime itself does not have a direct impact on the United States.

Because of this court's conclusion, the court need not discuss whether there are separate bases for asserting jurisdiction over defendants Juda and Van Der Hoeven for the assault and arson charges arising from the interception of Malekula by the Coast Guard.

### D.

■ Separate consideration must be given to defendant Manuel Avila, who is not a citizen of the United States or a resident alien. He is a citizen of the Philippines, was recruited for the voyage in southeast Asia, and has no other connection with the United States evident from the record. This court concludes that the United States may not constitutionally exercise jurisdiction over him.

The language of the statute would appear to encompass Avila. Section 1903(a) makes it unlawful for "any person" who is "on board a vessel subject to the jurisdiction of the United States" to possess a controlled substance with the intent to distribute it. And Section 1903(c) includes as a "vessel subject to the jurisdiction of the United States" a vessel "without nationality." As discussed above, Malekula was a stateless vessel.

However, the issue is whether the statute can constitutionally be applied to Avila. There is little reported authority bearing on this issue. *See United States v. Yunis*, 681 F.Supp. 896 (D.D.C.1988), *affirmed* 924 F.2d 1086 (D.C.Cir.1991); *United States v. Georgescu*, 723 F.Supp. 912 (E.D.N.Y. 1989). As stated, he had no connections with the United States other than being on the vessel. The offense which he committed occurred between southeast Asia and the international waters off of Canada. And there is insufficient evidence that any of the drugs were destined, even ultimately, for the United States. This court therefore believes that there is not a constitutionally sufficient nexus for the United States to exercise jurisdiction over him.

### V.

Defendants also move to suppress evidence obtained against them. They claim violations of their Fourth Amendment rights because a beeper was surreptitiously installed on board Malekula in Australia and was used to track the vessel during the voyage from southeast Asia to Canada.

The DEA had been investigating Juda, his crew and the vessel, and they had reliable information that the vessel would be used to smuggle drugs. While Malekula was in Australia, a DEA representative requested of Australian authorities that a beeper be installed in Malekula. The Australian authorities advised him that no warrant or court order was required for that action. With the cooperation of Australian authorities, DEA agents and the Australian police secretly entered Malekula and placed the beeper in an interior wall of the navigation room. A few months later they again surreptitiously entered the vessel to replace the batteries. The beeper was in place before defendants began to occupy Malekula, take on the cargo of hashish, and commence their voyage to Canada. The beeper was essentially a tracking devise, used by the United States and other authorities to keep track of Malekula during its passage from southeast Asia to Canada. Did those activities violate the Fourth Amendment rights of defendants, requiring suppression of the resulting evidence?

### A.

■ The United States argues that defendants do not have standing to raise their Fourth Amendment challenges. A defendant has standing to challenge a Fourth Amendment violation if he has a subjective expectation of privacy in the item seized or the place searched, and society recognizes that expectation as reasonable. *United States v. Pollock*, 726 F.2d 1456, 1465 (9th Cir.1984).

■ As discussed below, no one can have a reasonable expectation of privacy in the position of a vessel on the high seas, which was the only information disclosed by the monitoring of the beeper. However, every person on board Malekula has standing to challenge the legality of its stop. *Rakas v. Illinois*, 439 U.S. 128, 160 n. 5, 99

S.Ct. 421, 439 n. 5, 58 L.Ed.2d 387 (1978) (White, J., dissenting); *United States v. Williams*, 589 F.2d 210, 214 (5th Cir.1979), *aff'd*, 617 F.2d 1063 (5th Cir.1980) (en banc). Therefore, the only remaining issue is whether defendants have standing to challenge the installation of the beeper in Malekula's navigation room.

■ As Malekula's owner, Juda has standing to challenge its search. *United States v. Massell*, 823 F.2d 1503, 1506–07 (11th Cir.1987); *United States v. Williams*, 617 F.2d 1063, 1084–85 (5th Cir.1980) (en banc). Although Juda was not present when the beeper was installed or when its batteries were replaced, in *United States v. Quinn*, 751 F.2d 980, 981 (9th Cir.1984), the Ninth Circuit held that the owner of a boat had standing to object to its search, even though he was not on the vessel at the time.

Accordingly, defendant Juda has standing to object to the installation of the beeper on Malekula. Since the issues must therefore be resolved as to Juda, the court will assume, without deciding, that the defendant crew members also have standing.

### B.

Does the Fourth Amendment extend its protections outside of the United States, in this case in Australia and on the high seas?

The Fourth Amendment states that it protects "the people" against "unreasonable searches and seizures." In *United States v. Verdugo–Urquidez*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), the Supreme Court held that the Fourth Amendment does not apply to the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country. *Id.* at 261, 110 S.Ct. at 1058. The Court reasoned that a nonresident alien in a foreign country is not one of "the people" the Fourth Amendment protects. *Id.* at 265–66, 110 S.Ct. at 1060–61.

■ In *United States v. Davis*, 905 F.2d 245, 251 (9th Cir.1990), the Ninth Circuit extended the rule of *Verdugo–Urquidez* to searches on the high seas. There-fore, defendant Avila, who is neither a U.S. citizen nor a resident alien, is not protected by the Fourth Amendment. However, because the court has already determined that there is no jurisdiction over Avila, his Fourth Amendment standing is moot.

■ The other defendants are U.S. citizens or residents. Resident aliens are entitled to the same constitutional protections as U.S. citizens. *Verdugo–Urquidez*, 494 U.S. at 270–71, 110 S.Ct. at 1063–64. The defendants are entitled to the protections of the Fourth Amendment in searches conducted by U.S. agents abroad. As Justice Brennan, dissenting in *Verdugo–Urquidez* explained:

[T]he majority does not hold that the Fourth Amendment is inapplicable to searches outside the United States and its territories. It holds that respondent is not protected by the Fourth Amendment because he is not one of "the people." ...

Certainly nothing in the Court's opinion questions the validity of the rule, accepted by every Court of Appeals to have considered the question, that the Fourth Amendment applies to searches conducted by the United States government against United States citizens abroad. See, *e.g.*, *United States v. Conroy*, 589 F.2d 1258, 1264 (CA5), cert. denied, 444 U.S. 831 [100 S.Ct. 60, 62 L.Ed.2d 40] (1979); *United States v. Rose*, 570 F.2d 1358, 1362 (CA9 1978).

*Id.* 494 U.S. at 283 n. 7, 110 S.Ct. at 1070 n. 7 (Brennan, J., dissenting).

In *United States v. Rose*, 570 F.2d 1358 (9th Cir.1978), the Ninth Circuit adopted the rule that:

[I]f American law enforcement officials participated in the foreign search, or if the foreign authorities actually conducting the search were acting as agents for their American counterparts, the exclusionary rule can be invoked.

*Id.* at 1362 (citation omitted).

■ In this case, it is undisputed that the beeper was installed and its batteries were replaced in Australia at the request of American law enforcement officials.

And the investigation was directed against United States citizens or residents. This is sufficient to make the Fourth Amendment applicable to those activities.

 The Fourth Amendment also extends to the high seas. In *United States v. Peterson*, 812 F.2d 486 (9th Cir.1987), the court observed that:

> While neither the Supreme Court nor this court has stated definitively the extent to which fourth amendment protection apply upon the high seas, it has been assumed to apply in our major decisions. The government makes the same assumption here, so the case is presented as one in which the fourth amendment is applicable.

*Id.* at 494. *See also,* this court's decision in *United States v. Biermann*, 678 F.Supp. 1437, 1445 (N.D.Cal.1988) (assuming without deciding that Fourth Amendment applies).

Similarly, in this case the government does not argue that the Fourth Amendment is inapplicable on the high seas. And defendants do not challenge the existence of probable cause. Therefore, the Fourth Amendment focus is on whether the government's conduct was "reasonable" or "in good faith" under the circumstances of this case. *United States v. Villamonte-Marquez*, 462 U.S. 579, 588, 103 S.Ct. 2573, 2579, 77 L.Ed.2d 22 (1983).

### C.

The United States concedes that the intrusion into the interior of Malekula constituted a "search" within the meaning of the Fourth Amendment, but argues that the warrant requirement should be excused on the basis of reasonableness and good faith.

Rule 41 of the Federal Rules of Criminal Procedure authorizes a federal magistrate to issue a warrant:

> for a search of property ... within the district ... or outside the district if the property ... is within the district when the warrant is sought ...

In *United States v. Williams*, the court noted that under Rule 41 there was "substantial doubt that the federal district courts have the authority to issue ... a warrant" to search a vessel on the high seas. 617 F.2d at 1072. And in *United States v. Verdugo–Urquidez*, the Supreme Court observed that a warrant from a U.S. magistrate "would be a dead letter outside the United States." 494 U.S. at 274, 110 S.Ct. at 1066. The Court of Appeals also acknowledged this, but was of the opinion that it did not excuse the warrant requirement because:

> A warrant issued by a detached magistrate here would reflect the magistrate's determination that probable cause to search existed. It would also define the scope of the search. These constitutional protection are afforded by the warrant requirement; they are not affected by whether or not a foreign government would give legal effect to the warrant.

*U.S. v. Verdugo–Urquidez*, 856 F.2d 1214, 1230 (9th Cir.1988), *rev'd*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). The Supreme Court rejected the Court of Appeals' "global view" of the applicability of the Fourth Amendment abroad, especially its warrant requirement, but did not decide whether a warrant may be required for searches conducted abroad against Americans, as opposed to foreigners. 494 U.S. at 274, 110 S.Ct. at 1066.

After *Verdugo–Urquidez* was decided, the Judicial Conference of the United States proposed an addition to Rule 41 that would have provided for warrants to search property outside the United States. Fed. R.Crim.P. 41(a), 1990 Advisory Committee's note. However, the Supreme Court has not adopted this amendment, which it believed required further consideration. *Id.*

 It is undisputed that the DEA representative in Australia spoke with his Australian counterpart, a Superintendent with the Drug Operations Branch of the International Division of the Australian Federal Police, and requested information on Australian law governing the installation of the beeper. He was told that no warrant was required under Australian law, and that the Australian Federal Police would assist with the installation. Both the initial installation of the beeper and the

subsequent replacement of the batteries were accomplished with the assistance of both Australian Customs and Federal Police officers. These activities fall within the "good faith" exception to the exclusionary rule.

In *United States v. Peterson*, 812 F.2d 486 (9th Cir.1987), DEA agents and Philippine authorities conducted a joint investigation that included wiretaps in the Philippines, and resulted in a criminal prosecution in the United States. The court held that even if the wiretaps were in violation of Philippine law, the evidence should not be excluded because the U.S. authorities "sought and received assurances from high ranking law enforcement authorities in the Philippines that all necessary authorization was being obtained." *Id.* at 492. The court reasoned that the "good faith" exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), should apply because the exclusionary rule is meant to deter federal officers from illegal conduct, and it "does not function as a deterrent in cases in which the law enforcement officers acted on a reasonable belief that their conduct was legal." *Id.* at 491–92. For the same reasons, the exclusionary rule should not apply in this case.

### D.

Defendants argue that the monitoring of the beeper for four months without a warrant was unreasonable and in violation of the Fourth Amendment.

In *U.S. v. Bailey*, 628 F.2d 938 (6th Cir. 1980), the court held that a warrant which authorized the installation of a beeper, but contained no time limit on the monitoring of its signal, was unreasonable and therefore invalid. *Id.* at 945–46 (monitoring continued for 70 days). *Accord, United States v. Butts*, 710 F.2d 1139, 1150–52 (5th Cir.1983) (monitoring beeper four days after expiration of warrant unlawful); *United States v. Brock*, 667 F.2d 1311, 1322 (9th Cir.1982) (disapproving unlimited beeper surveillance).

However, those cases were decided before the United States Supreme Court de-

cided *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), which held that the use of a beeper to locate a car did not constitute a "search" under the Fourth Amendment, because respondents had no reasonable expectation of privacy in the *location* of their vehicle when travelling along public roads. *Id.* at 280–85, 103 S.Ct. at 1084–87. The first *Butts* decision was then reversed by the Fifth Circuit *en banc;* it held that under *Knotts*, no Fourth Amendment right was infringed by using a beeper to track the suspect's aircraft in public airspace. 729 F.2d 1514, 1517–18 (5th Cir.1984).

 In this case, the beeper was monitored to determine the position of Malekula on the high seas, and that monitoring was not a "search" within the meaning of the Fourth Amendment.

Defendants argue that this case is more like *United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) than *Knotts*. In *Karo*, the Supreme Court held that the Fourth Amendment was implicated because a beeper was used to determine that contraband was present inside respondent's house, in which he had a reasonable expectation of privacy, and this information could not have been obtained by visual surveillance without a warrant. 468 U.S. at 714–15, 104 S.Ct. at 3302–03. Defendants analogize that Malekula was their home at sea, in which they had a reasonable expectation of privacy. However, the beeper was not used to detect anything going on inside Malekula. Rather, it was used to determine the position of Malekula itself, information that *could* lawfully be obtained without a warrant by visual surveillance.

### VI.

Defendants also move to suppress the hashish seized from the Malekula, because it is the fruit of an unlawful stop. This portion of their motion is based on their arguments that the United States does not have jurisdiction over them, and that Malekula was improperly intercepted at night.

## A.

Defendants concede that the Coast Guard may stop a foreign vessel on the high seas without a warrant based upon a reasonable suspicion that the vessel's occupants are in violation of U.S. law. They argue that the stop was improper because the United States may not exercise jurisdiction over them, and any activities of importing hashish into Canada did not violate any U.S. law. The court has already concluded that it has jurisdiction over all of the defendants except Avila. Defendants do not contend that the Coast Guard lacked the reasonable suspicion or probable cause necessary to justify a stop. Therefore, the stop was not unlawful.

## B.

The Coast Guard intercepted Malekula at 4:00 a.m. Defendants argue that this violated the Fourth Amendment.

Rules 41(c) and (h) of the Federal Rules of Criminal Procedure require that a search warrant be executed between the hours of 6:00 a.m. and 10:00 p.m., unless the warrant authorizes nighttime execution "for reasonable cause shown." The Ninth Circuit has interpreted this rule to "require both specific authorization for a nighttime search, and that sufficient facts in the affidavit must support the magistrate's authorization." *United States v. Stefanson*, 648 F.2d 1231, 1236 (9th Cir.1981).

Defendants acknowledge that the Coast Guard did not need a search warrant to stop and search Malekula; it needed only reasonable suspicion or probable cause, which defendants concede was present. Since no search warrant was required, Rules 41(c) and (h) do not apply. The only question is whether the nighttime interception was "unreasonable" in violation of the Fourth Amendment.

The government argues that there was no nighttime search or attempted boarding because the Coast Guard commander did not intend to board Malekula without the consent of her captain or a country of registry. However, a person has been "seized" within the meaning of the Fourth Amendment when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *U.S. v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The U.S. Customs agent exhorted defendant Juda to have his crew assemble on the transom, and to "come on out" because "it is all over." This was a "seizure" of Malekula and her crew, whatever the commander's subjective intent about boarding. *See, United States v. Williams*, 617 F.2d 1063, 1071 n. 1 (5th Cir.1980) (en banc) ("Even the mere stopping of a vessel, without a boarding, is a fourth amendment 'seizure' since the governmental action restrain's the vessel's freedom to proceed").

Defendants rely on *United States v. Piner*, 608 F.2d 358 (9th Cir.1979), in which the court suppressed evidence seized from a boat stopped at night for a random safety and document check. The court concluded that:

> [T]he random stop and boarding of a vessel after dark for safety and registration inspection without cause to suspect noncompliance is not justified by the governmental need to enforce compliance with safety regulations and constitutes a violation of the Fourth Amendment. A stop and boarding after dark must be for cause, requiring at least a reasonable suspicion of noncompliance....

*Id.* at 361.

However, the facts in this case are different. The Coast Guard possessed reasonable suspicion that Malekula was carrying drugs in violation of U.S. law, satisfying the strictures of *Piner*. Title 14 U.S.C. § 89(a) authorizes the Coast Guard to board vessels on the high seas "at any time" to enforce U.S. laws. The Coast Guard Commander testified at the hearing that in his experience the potential for violence during maritime drug seizures is less at night, when crew members of the smuggling vessel are likely to be asleep or unprepared. The interception at 4:00 a.m. was reasonable under these circumstances.

## VII.

For the reasons stated, IT IS ORDERED that:

(1) The indictment against defendant Manuel Avila is dismissed;

(2) The other motions of defendants are denied; and

(3) A trial setting and status conference will be held on July 10, 1992, at 1:30 p.m. If this date poses any difficulties under the Speedy Trial Act, the United States Attorney may advise the court and the date will be advanced.